IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-600

No. COA21-10

Filed 6 September 2022

Wake County, Nos. 18 CRS 205570–71, 205588

STATE OF NORTH CAROLINA

v.

JOSEPH EDWARDS TEAGUE, III

Appeal by defendant from judgments entered 31 January 2020 by Judge Thomas H. Lock in Wake County Superior Court. Heard in the Court of Appeals 1 December 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kristin J. Uicker, for the State.*

*Hynson Law, PLLC, by Warren D. Hynson, for defendant-appellant.*

ZACHARY, Judge.

¶ 1     Defendant Joseph Edwards Teague, III, appeals from judgments entered upon a jury's verdicts finding him guilty of conspiracy to traffic marijuana by transportation, possession with intent to sell or deliver marijuana, felony possession of marijuana, felony keeping or maintaining a storage unit for keeping or selling controlled substances, felony keeping or maintaining a dwelling for keeping or selling controlled substances, and possession with intent to sell or deliver delta-9-tetrahydrocannabinol ("THC"). After careful review, we affirm the trial court's denial

of Defendant's motion to suppress, and conclude that Defendant received a trial free from prejudicial error.

## I.   Background

On 21 March 2018, Investigator Selburn Menzie of the Wake County Sheriff's Office High-Intensity Drug Trafficking Areas ("HIDTA") Task Force was working at a FedEx facility as part of his routine parcel interdiction duty. On the conveyor belt, he observed a package (the "target package") with "all the seams . . . taped," which he later testified was "one of many indicators" that a parcel may contain illegal drugs. The target package named "Marcus Rawls" as its sender and "Joe Teague" as its intended recipient. The shipping label indicated that the target package had been shipped from California and listed "(888) 888 8888" as the telephone number for the addressee, "Joe Teague" in Raleigh, North Carolina. In his experience and training as a member of the HIDTA Task Force, Investigator Menzie recognized these as additional indicators of possible drug smuggling.

Investigator Menzie removed the target package from the belt and ran the sender and recipient information from the shipping label through two law enforcement databases. From these databases, Investigator Menzie determined that the phone number given for the target package's sender "Marcus Rawls" did not match the phone number for the listed shipping address, and he confirmed that the "(888) 888 8888" phone number provided for its recipient "Joe Teague" did not exist.

Investigator Menzie also noticed that the target package had been sent from a different location than its listed shipping address. Investigator Menzie then placed the target package in a line with "four or five" other similar parcels. His partner, Officer James Smith, was already on the scene with his certified narcotics detector dog, Hydro. At Officer Smith's command, Hydro conducted a drug sniff of the packages. Hydro alerted to the target package.

¶ 4         Investigator Menzie removed the target package from the FedEx facility and obtained a search warrant for it. Investigator Menzie, Officer Smith, and other law enforcement officers then opened the target package at the interdiction unit office. Inside the target package, the officers found approximately 15 yellow envelopes, each containing vacuum-sealed bags of a green, leafy substance that they recognized as marijuana; inside one of the bags, they also discovered what appeared to be a GPS tracking device. After weighing and photographing the contents of each bag, the officers determined that the target package contained approximately 15 pounds of the green, leafy substance that they recognized as marijuana.

¶ 5         Investigator Menzie then drove to the address listed on the target package's shipping label, where he saw people (including one later identified as Defendant) in the driveway. While surveilling the recipient's address, Investigator Menzie observed that there was a self-storage facility approximately two miles away. He later testified that the proximity of this facility was noteworthy to him "[b]ecause a storage unit is

commonly used by individuals who [are] dealing with large amounts of illegal substance to store away sometimes from their residence, sometimes just to disassociate themselves from the residence that they're actually living in."

¶ 6    Later that day, a FedEx employee informed Investigator Menzie that a man identifying himself as "Marcus" had called FedEx to inquire about the status of the target package, and that he left a phone number at which to contact him with further information. Investigator Menzie called Marcus, who confirmed the tracking number of the target package, its shipping address, and the name of its intended recipient. At that point, Investigator Menzie identified himself as a law enforcement officer; Marcus reacted with surprise, cussed, and abruptly ended the call.

¶ 7    The next day, on 22 March 2018, Investigator Menzie, Officer Smith, and Sergeant Daniel Wright investigated the self-storage facility near the intended recipient's address. Officer Smith took Hydro to a row of storage units that were "out of sight[,]" and Hydro alerted to a particular unit. Investigator Menzie left to obtain a search warrant for the unit. Before Investigator Menzie returned, Defendant arrived and approached the unit with a bag in his hand. Sergeant Wright intercepted Defendant and patted him down.

¶ 8    When Defendant placed the bag on the back of his car, Sergeant Wright observed a substance inside of the bag that he recognized, from his training and experience, as "marijuana wax." Sergeant Wright handcuffed Defendant, and they

waited for Investigator Menzie to return with the search warrant. After Investigator Menzie returned and read the search warrant to Defendant, the officers opened the storage unit with the use of a key provided by Defendant. Inside, the officers found a box containing more vacuum-sealed bags of what appeared to be the same green, leafy substance that they recognized as marijuana, and a suitcase containing several clear jars of a brown substance that Sergeant Wright later testified was "commonly referred to as shatter . . . . [I]t's cooked-down marijuana. It's highly concentrated THC."

¶ 9 Investigator Menzie then obtained a document search warrant for Defendant's residence, which matched the address for the intended recipient of the target package. Law enforcement officers executed the search warrant that same day and discovered items that they believed to be drugs and drug paraphernalia. At that point, the officers temporarily halted the search until they obtained a drug search warrant; then, the search resumed. Inside a padlocked bedroom, officers discovered empty vacuum-sealed bags in a dresser drawer; a butane gas canister used to manufacture marijuana wax; a digital scale hidden behind a television; a bong; an e-cigarette with cartridges containing a brown liquid; and glass jars similar to those found in the search of Defendant's storage unit.

¶ 10 On 5 June 2018, a Wake County grand jury returned indictments charging Defendant with two counts of conspiracy to traffic marijuana (one charge by

transportation and one by possession); two counts of possession with intent to sell or deliver marijuana; one count of possession with intent to sell or deliver THC; two counts of possession of marijuana; one count of maintaining a storage unit for purposes of keeping or selling controlled substances; and one count of maintaining a dwelling for purposes of keeping or selling controlled substances.

¶ 11    On 19 November 2018, Defendant moved to suppress "evidence obtained as the result of an unconstitutional seizure of the [target package] addressed to . . . Defendant, the unconstitutional search, seizure, and interrogation of [Defendant], and the unconstitutional search and seizure of [Defendant]'s storage locker and residence." On 27 January 2020, Defendant's motion came on for hearing in Wake County Superior Court. After considering the motion and arguments of counsel, the trial court denied Defendant's motion from the bench. No written order was entered.

¶ 12    At the close of the State's evidence, Defendant moved to dismiss all charges against him, which the trial court denied. Defendant renewed his motion to dismiss at the close of all evidence, which the trial court again denied. The State then voluntarily dismissed the charge of conspiracy to traffic marijuana by possession. During the charge conference, the trial court *sua sponte* dismissed one count of possession with intent to sell or deliver marijuana and one count of felony possession of marijuana.

¶ 13    On 31 January 2020, the jury returned its verdicts finding Defendant guilty of

the remaining charges. The trial court sentenced Defendant to an active term of 25–39 months in the custody of the North Carolina Division of Adult Correction for conspiracy to traffic marijuana by transportation. The trial court then consolidated the remaining convictions into three judgments, sentenced Defendant to three consecutive terms of 5–15 months in the custody of the North Carolina Division of Adult Correction, then suspended these sentences and ordered that Defendant be placed on supervised probation for a period of 24 months following his release from incarceration. Defendant gave oral notice of appeal in open court.

## II.   Discussion

On appeal, Defendant raises several constitutional issues concerning the investigation of the target package. Defendant argues that the trial court erred by denying his motion to suppress because law enforcement officers lacked either probable cause or reasonable suspicion to support (1) the initial removal of the target package from the conveyor belt at the FedEx facility and (2) the temporary retention of the target package to effectuate a drug dog sniff.

Defendant then makes several arguments that arise from our General Assembly's legalization of industrial hemp. *See* An Act to Recognize the Importance and Legitimacy of Industrial Hemp Research, to Provide for Compliance with Portions of the Federal Agricultural Act of 2014, and to Promote Increased Agricultural Employment, S.L. 2015-299, 2015 N.C. Sess. Laws 1483. The Industrial

Hemp Act "legalized the cultivation, processing, and sale of industrial hemp within the state, subject to the oversight of the North Carolina Industrial Hemp Commission." *State v. Parker*, 277 N.C. App. 531, 2021-NCCOA-217, ¶ 27, *disc. review denied*, 378 N.C. 366, 860 S.E.2d 917 (2021).

¶ 16        In sum, Defendant argues that "[b]ecause industrial hemp and marijuana . . . are identical in appearance and odor, and both contain THC, law enforcement officers and drug-detecting canines are unable to distinguish the two without a quantitative test measuring the chemical percentage of THC, irrespective of their training and experience." Thus, Defendant maintains that (1) the trial court erred by denying his motion to suppress because the green, leafy substance inside the target package was seized prior to determining whether it contained an unlawful concentration of THC; (2) the indictment charging Defendant with possession with intent to sell or deliver THC was facially invalid because it failed to specifically allege an unlawful concentration of THC; (3) the trial court erred by denying Defendant's motion to dismiss the charge of possession with intent to sell or deliver THC because the State presented insufficient evidence that the brown material recovered during lawful searches of Defendant's storage unit, residence, and the bag that he was carrying when he arrived at the storage unit contained an unlawful concentration of THC; and (4) the trial court erred by permitting several of the State's witnesses to offer opinion testimony identifying the various seized substances as "marijuana," "marijuana wax,"

"shatter," and "highly concentrated THC," absent a scientifically valid chemical analysis of each substance, in violation of Rule 702 of the North Carolina Rules of Evidence.

¶ 17 Defendant further argues that the trial court committed plain error by admitting evidence regarding the chemical analysis of the seized material discovered inside the target package, in violation of his constitutional right to confront testimonial witnesses against him.

¶ 18 Finally, Defendant advances a pair of arguments concerning the charge of conspiracy to traffic marijuana by transportation. Defendant contends that the trial court erred by denying his motion to dismiss this charge due to insufficient evidence, and that the trial court erred by admitting into evidence a recording of a phone call between Investigator Menzie and Marcus Rawls, Defendant's alleged co-conspirator.

**A. Motion to Suppress**

¶ 19 We begin by addressing Defendant's constitutional arguments concerning the initial removal of the target package from the conveyor belt at the FedEx facility and the subsequent searches and seizures that followed. Defendant raises several arguments arising under the federal and state constitutions, essentially claiming that the trial court erred by denying his motion to suppress because law enforcement

officers lacked either probable cause or reasonable suspicion[1] to seize the target package at the FedEx facility. However, for the following reasons, we affirm the trial court's denial of Defendant's motion to suppress.

### 1. Standard of Review

"In evaluating the denial of a motion to suppress, the reviewing court must determine whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law." *State v. Williams*, 366 N.C. 110, 114, 726 S.E.2d 161, 165 (2012) (citation and internal quotation marks omitted). "The trial court's findings of fact on a motion to suppress are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *Id.* (citation and internal quotation marks omitted). "Findings of fact that are not challenged on appeal are deemed to be supported by competent evidence and are binding upon this Court." *State v. Lane*, 280 N.C. App. 264, 2021-NCCOA-593, ¶ 12 (citation and internal quotation marks omitted). "Conclusions of law are reviewed de novo and are fully reviewable on appeal." *Williams*, 366 N.C. at 114, 726 S.E.2d at 165 (citation and internal quotation marks omitted).

---

[1] Defendant argues that "this Court could—and should—rule under our State Constitution that probable cause is required to seize and investigate a parcel," rather than continuing to apply the reasonable suspicion standard adopted by the United States Supreme Court. *See United States v. Van Leeuwen*, 397 U.S. 249, 252–53, 25 L. Ed. 2d 282, 285–86 (1970). As discussed in section II.A.2 below, we decline Defendant's invitation to address this issue.

### 2. *The Trial Court's Ruling*

¶ 21    At the outset of the hearing on Defendant's motion to suppress, the State argued that Defendant lacked standing to challenge the various searches or seizures in this matter. The trial court concluded otherwise, determining that Defendant had standing based on *United States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002), *cert. denied*, 538 U.S. 1023, 155 L. Ed. 2d 867 (2003), and *United States v. Rose*, No. 7:17-CR-69-D, 2018 WL 4515884, at *4 (E.D.N.C. Sept. 20, 2018), *aff'd*, 3 F.4th 722 (4th Cir. 2021), *cert. denied*, 596 U.S. ___, 212 L. Ed. 2d 582 (2022). After a hearing on the merits, the trial court denied Defendant's motion to suppress. The court instructed the assistant district attorney to prepare a proposed order[2] consistent with the following orally rendered findings of fact and conclusions of law:

> You should find the facts by a preponderance of the evidence that on the day in question, March 21, 2018, these officers were working interdiction at Fed Ex, that Fed Ex facility on Atlantic Avenue; that they observed this parcel coming down the conveyor belt, and their attention was attracted to it by the fact that all the seams were taped, which, based upon their training and experience -- or, rather, training and experience of Investigator Menzie, is an indication of a parcel which might contain controlled substances.
>
> That upon examination of the shipping label, the phone number listed for the recipient appeared to be fictitious. It was 888-8888.

---

[2] No written order on Defendant's motion to suppress appears in the record on appeal.

That the officers removed the package from the conveyor belt and examined it further. Upon running the name and address and phone number for the sender through the law enforcement databases -- and you should identify those which they were employing -- it appeared that the address for the sender was fictitious; that the phone number for the sender was fictitious; that the sender, in fact, lived at another address; that the package was actually shipped out of Sun Valley, California, not North Hollywood, California.

That the officers then placed the package in a lineup with four other parcels and had a K-9 or dog trained in narcotics detection, which dog is on the scene with its handler, sniff the packages. Include as a fact, of course, that the dog was certified, and please include the name of the certifying agency.

That the dog alerted on the suspect package, and based upon this information, the officers seized the package and applied to the magistrate for a search warrant.

Based upon these facts, the Court would conclude as a matter of law that [D]efendant did have standing to challenge the search warrant based upon the fact that [D]efendant is the named recipient of the package; that a reasonable and articulable suspicion existed sufficient to justify the brief detention of the package for purposes of having a drug dog sniff it; and that the retention of the package was for a reasonable period of time given that the dog was on the scene. And, in fact, as a finding of fact, you may include that the process of this lineup took about five to ten minutes.

And that based upon the totality of the circumstances, probable cause existed for the issuance of the search warrant for the parcel. And, accordingly, the motion to suppress the issuance of the search warrant and seizure of the parcel is denied.

¶ 22    On appeal, Defendant does not specifically challenge any of the trial court's

findings of fact, and therefore they are binding upon this Court. *Lane*, 280 N.C. App. 264, 2021-NCCOA-593, ¶ 12. Rather, Defendant challenges the trial court's conclusion of law, based upon the unchallenged facts, that "the brief detention of the [target] package for purposes of having a drug dog sniff it" was supported by reasonable suspicion.[3]

¶ 23     We conclude that Defendant's Fourth Amendment rights were not violated in the case at bar. At the outset, we do not accept Defendant's initial contention that the mere removal of the target package from the conveyor belt for a drug dog sniff was a "seizure" implicating his Fourth Amendment rights. Neither was the drug dog sniff at the FedEx facility a "search" infringing upon any of Defendant's Fourth Amendment rights. Accordingly, because Defendant's challenges do not implicate any Fourth Amendment rights, Defendant does not have standing to raise his Fourth Amendment arguments on appeal.

---

[3] The United States Supreme Court has determined that a warrantless postal interdiction must be supported by reasonable suspicion of illegal activity afoot. *See Van Leeuwen*, 397 U.S. at 252–53, 25 L. Ed. 2d at 285–86. However, Defendant invites this Court to interpret the North Carolina Constitution as requiring that the State satisfy the more stringent probable cause standard in warrantless postal interdictions. *See State v. Carter*, 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988) ("Even were the two provisions identical, we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision."), *superseded in part by statute on other grounds*, An Act to Provide for the Adoption of the Good Faith Exception to the Exclusionary Rule into State Law, S.L. 2011-6, § 2, 2011 Sess. Laws 10, 11. Given our disposition of Defendant's other Fourth Amendment arguments, we need not address this issue at this juncture.

However, assuming, *arguendo*, that Defendant's Fourth Amendment rights were implicated and that he did have Fourth Amendment standing, we also conclude that he waived appellate review of these arguments. Each of these reasons compels our conclusion that the trial court did not err by denying Defendant's motion to suppress.

### 3. *Removal of the Target Package*

At all stages of this case, from the suppression hearing through appellate briefing, Defendant has maintained that the initial removal of the target package from the conveyor belt was a seizure in violation of the Fourth Amendment. After careful review, we disagree.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The North Carolina Constitution affords similar protection." *State v. Cabbagestalk*, 266 N.C. App. 106, 111, 830 S.E.2d 5, 9 (2019); *see* N.C. Const. art. I, § 20. "Before a defendant can assert the protection afforded by the Fourth Amendment, however, he must demonstrate that any rights alleged to have been violated were his rights, not someone else's." *Lane*, 280 N.C. App. 264, 2021-NCCOA-593, ¶ 18 (citation omitted). "A person's right to be free from unreasonable searches and seizures is a personal right, and only those persons whose rights have been infringed may assert the protection of the Fourth

Amendment." *Id.* (citation omitted).

"Standing requires *both* an ownership or possessory interest and a reasonable expectation of privacy." *Id.* ¶ 20 (citation omitted). "[T]he burden of showing this ownership or possessory interest is on the person who claims that his rights have been infringed." *State v. Rodelo*, 231 N.C. App. 660, 662, 752 S.E.2d 766, 770 (citation omitted), *disc. review denied*, 367 N.C. 523, 762 S.E.2d 204 (2014). A defendant's standing under the Fourth Amendment is considered in light of the totality of the circumstances. *State v. Austin*, 320 N.C. 276, 289, 357 S.E.2d 641, 649, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224 (1987).

The privacy expectation in cases such as that at bar is manifest. "Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable." *United States v. Jacobsen*, 466 U.S. 109, 114, 80 L. Ed. 2d 85, 94 (1984). "Both the sender and the designated recipient of a package sent by mail or other carrier have a legitimate expectation of privacy in the contents of that package." *United States v. Hurley*, 182 F. App'x 142, 145 (4th Cir.), *cert. denied*, 549 U.S. 905, 166 L. Ed. 2d 183 (2006)[4]; *see also Jacobsen*, 466 U.S. at 114, 80 L. Ed. 2d

---

[4] It is axiomatic that the courts of North Carolina must treat "decisions of the United States Supreme Court as binding" on issues arising under the federal constitution, but our Supreme Court has repeatedly recognized that we may also "accord[ ] to decisions of lower

at 94.

¶ 29      Nonetheless, "[t]he intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent. The seizure may be made after the owner has relinquished control of the property to a third party[,]" such as an express courier. *United States v. Place*, 462 U.S. 696, 705, 77 L. Ed. 2d 110, 119–20 (1983). A sender who voluntarily relinquishes control of a package to a private courier may be "unable to show that the invasion intruded upon either a privacy interest in the contents of the packages or a possessory interest in the packages themselves." *Id.* at 705–06 n.6, 77 L. Ed. 2d at 120 n.6 (citation omitted).

¶ 30      Therefore, in postal interdiction cases just as in other Fourth Amendment contexts, the nature and extent of the intrusion upon the privacy interest in the contents of a package vary with the totality of the circumstances. Indeed, as Justice Brennan noted in *Place*, "the mere detention of mail not in [an addressee's] custody or control amounts to at most a minimal or technical interference with his person or effects, resulting in no personal deprivation at all." *Id.* at 718 n.5, 77 L. Ed. 2d at 128 n.5 (Brennan, J., concurring) (citation omitted).

¶ 31      Here, the only support for the trial court's conclusion of law that Defendant had standing to challenge the removal of the target package from the conveyor belt

---

federal courts such persuasiveness as these decisions might reasonably command." *State v. Berryman*, 360 N.C. 209, 212, 624 S.E.2d 350, 353 (2006) (citation omitted).

is the trial court's finding of fact that Defendant "is the named recipient of the package[.]" This finding of fact is unchallenged and is, therefore, binding on appeal. *See Lane*, 280 N.C. App. 264, 2021-NCCOA-593, ¶ 12. Upon review of the pertinent case law, however, we conclude that the mere fact that the target package was addressed to Defendant is insufficient, on its own, to vest Defendant with standing to assert the various Fourth Amendment arguments he advances.

¶ 32     At the suppression hearing, the trial court relied, in part, on a pair of federal cases to conclude that Defendant had Fourth Amendment standing as the named addressee of the target package: *Rose*, 2018 WL 4515884, at *4–*5 (concluding that the intended recipient of packages subsequently found to contain contraband lacked standing to challenge law enforcement officers' search and seizure of the packages, which were not addressed to him and were shipped to a location at which he did not reside), and *Hernandez*, 313 F.3d at 1209–10 (determining that a named recipient's "protected interest in the timely delivery" of a package was sufficient, in and of itself and without regard to the context and character of the intrusion upon that interest, to vest the recipient with standing to challenge a law enforcement officer's "initial detention of the package and the delay in calling for a canine unit to sniff the package").

¶ 33     Notwithstanding the conclusions of these federal cases, we are cognizant of the United States Supreme Court's recent reminder that the concept of Fourth

Amendment standing "is not distinct from the merits and is more properly subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 584 U.S. ___, ___, 200 L. Ed. 2d 805, 818 (2018) (citation and internal quotation marks omitted). Thus, the question of Defendant's standing to raise the various Fourth Amendment challenges he now asserts on appeal simply cannot be divorced from the ultimate constitutional questions themselves, including the nature of Defendant's asserted interest in the target package[5] and the character of the alleged intrusion upon that

---

[5] Notably, after the trial court concluded that Defendant had Fourth Amendment standing based on the fact that "the package was addressed to him[,]" Defendant spent the rest of trial arguing the opposite. In fact, Defendant *actively disclaimed* any ownership interest or expectation of privacy through his subsequent, frequent assertions that he was *not* the intended recipient of the target package.

    For example, when Defendant moved to dismiss the charges at the close of all evidence, his attorney repeatedly argued that the target package could also have been intended for Defendant's similarly named father, Joseph Teague, Jr., who also lived at the residence to which the target package was addressed and who Investigator Menzie testified was also considered a suspect during the investigation. Further, when arguing against the conspiracy charges, defense counsel stated that "[t]he only connection you have [between Defendant and his alleged co-conspirator, Marcus] is a label addressed to a Joe Teague, which could refer to the two people at that address, both of whom were suspected, only one of whom was charged." Defense counsel also argued that the man identifying himself as "Marcus" never identified his "friend" with any greater specificity than "Joe Teague" during the recorded phone call with Investigator Menzie.

    Defendant continues to argue on appeal that the State did not produce sufficient evidence proving that he—rather than his father, Joseph Teague, Jr.—was the intended recipient of the target package. Defendant asserts in his appellate brief that the name "Joe Teague" on the target package "raised no more than a suspicion that [D]efendant in this case was the intended recipient at [the residence] since [D]efendant's father, Joe Teague, Jr., also resided at [that address]. In fact, [Defendant] never even called FedEx about" the target package. Because Defendant repeatedly argued to the trial court—and maintains on appeal—that he was *not* the intended recipient of the package, he has disclaimed any property interest or expectation of privacy in the package or its contents, and has no standing to challenge the search or seizure of the package. *See Rodelo*, 231 N.C. App. at 662, 752 S.E.2d at 770.

interest.

¶ 34    "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113, 80 L. Ed. 2d at 94. As the *Hernandez* Court recognized, "[a]lthough a person has a legitimate interest that a mailed package will not be opened and searched en route, there can be no reasonable expectation that postal service employees will not handle the package or that they will not view its exterior[.]" 313 F.3d at 1209–10 (citation omitted). The *Hernandez* Court further explained that the recipient of a mailed package has a different interest in the package than its sender:

> The recipient of a mailed item . . . has a reasonable expectation that the mail will not be detained by postal employees beyond the normal delivery date and time. In other words, *an addressee's possessory interest is in the timely delivery of a package*, not in having his package routed on a particular conveyor belt, sorted in a particular area, or stored in any particular sorting bin for a particular amount of time.

*Id.* at 1210 (emphasis added) (citation and internal quotation marks omitted). Therefore, "even though first-class mail is protected by the Fourth Amendment from unreasonable search and seizure, it is not beyond the reach of all inspection. Rather, the question is whether the conditions for its detention and inspection have been satisfied." *Id.* (citations and internal quotation marks omitted); *United States v. Van Leeuwen*, 397 U.S. 249, 251–52, 25 L. Ed. 2d 282, 285 (1970).

¶ 35    In *Van Leeuwen*, for example, the United States Supreme Court concluded that law enforcement officers' warrantless detention of a first-class package for approximately 29 hours while they obtained a search warrant did not implicate the defendant's privacy interest:

> No interest protected by the Fourth Amendment was invaded by forwarding the packages the following day rather than the day when they were deposited. *The significant Fourth Amendment interest was in the privacy of this first-class mail; and that privacy was not disturbed or invaded until the approval of the magistrate was obtained.*

397 U.S. at 253, 25 L. Ed. 2d at 286 (emphasis added).

¶ 36    Although neither the appellate courts of North Carolina nor the United States Court of Appeals for the Fourth Circuit have directly addressed Fourth Amendment standing in the context of postal interdiction, other federal circuit courts of appeals have considered this issue. For example, the Ninth Circuit has concluded that, "for the purposes of the Fourth Amendment, no seizure occurs if a package is detained in a manner that does not significantly interfere with its timely delivery in the normal course of business." *United States v. Quoc Viet Hoang*, 486 F.3d 1156, 1162 (9th Cir. 2007), *cert. denied*, 552 U.S. 1144, 169 L. Ed. 2d 813 (2008); *see also id.* (holding that "the ten minute detention of [a defendant]'s package in the FedEx hold room without reasonable suspicion d[id] not implicate his Fourth Amendment rights"). We find this analysis persuasive.

¶ 37        In the instant case, when the trial court denied Defendant's motion to suppress, it found as fact that Hydro was "on the scene with" Officer Smith and that "the process of this lineup took about five to ten minutes." Defendant does not challenge these findings of fact, and they are, therefore, binding on appeal. *See Lane*, 280 N.C. App. 264, 2021-NCCOA-593, ¶ 12. Based on these unchallenged findings, the trial court concluded that "the retention of the [target] package was for a reasonable period of time given that the dog was on the scene." Defendant's insistence that this temporary retention of the target package amounted to a seizure implicating his Fourth Amendment rights is not supported by the relevant case law, as a delay of approximately five to ten minutes to procure an on-site canine unit for a drug sniff of an apparently suspicious package did "not significantly interfere with [the target package's] timely delivery in the normal course of business." *Quoc Viet Hoang*, 486 F.3d at 1162. Accordingly, we disagree with Defendant's argument that the mere removal of the target package from the conveyor belt for a drug dog sniff was a "seizure" implicating the Fourth Amendment.

¶ 38        Defendant also challenges several investigatory acts undertaken by law enforcement officers before Investigator Menzie obtained a search warrant to open the target package upon Hydro's positive alert to the presence of controlled substances during the drug dog sniff conducted at the FedEx facility. For the reasons explained above, the initial removal of the target package from the conveyor belt was

not a "seizure" implicating Defendant's Fourth Amendment rights. As the trial court properly concluded, "a reasonable and articulable suspicion existed sufficient to justify the brief detention of the package for purposes of having a drug dog sniff it; and . . . the retention of the package was for a reasonable period of time given that the dog was on the scene."

¶ 39 Neither was Hydro's drug sniff a "search" implicating Defendant's Fourth Amendment rights. And, given that Hydro alerted to the target package in the line-up, the trial court correctly concluded "that based upon the totality of the circumstances, probable cause existed for the issuance of the search warrant for the parcel." Taken together, neither the removal of the package nor the drug dog sniff violated Defendant's Fourth Amendment right to be free from unreasonable searches and seizures because under the facts presented, those acts constituted neither a seizure (the removal) nor a search (the drug dog sniff). Rather, those acts, viewed in the totality of the circumstances, merely provided further support for Investigator Menzie's determination that probable cause existed to obtain a search warrant to open the target package. Accordingly, the trial court did not err by denying Defendant's motion to suppress.

¶ 40 Moreover, the subsequent searches and seizures flowing from these acts—which Defendant lacks standing to challenge—were supported by valid warrants. Defendant challenges the validity of these warrants solely for want of probable cause,

based on the same Fourth Amendment arguments that we have addressed and determined to be without merit. Yet each search warrant application reveals that law enforcement officers properly built their investigation step by step.

¶ 41 Having determined that probable cause existed to support his application for a search warrant of the target package, Investigator Menzie immediately sought and obtained one, and the resultant search yielded approximately 15 pounds of vacuum-sealed marijuana and a GPS tracker. When Investigator Menzie surveilled the residence to which the target package was addressed, he noticed a nearby storage facility and subsequently learned that Defendant rented a unit at that location. In a second drug dog sniff—which Defendant does not challenge on appeal—Hydro alerted to Defendant's storage unit, and within an hour Defendant arrived at the unit carrying a tote in which was visible a brown substance that law enforcement officers believed was THC. These facts, combined with the previously developed probable cause, gave rise to further probable cause sufficient to support the issuance of a search warrant for the storage unit. That lawful search, in turn, provided sufficient probable cause to support the issuance of a document search warrant for the residence, the search of which provided sufficient probable cause to support the issuance of a controlled substances search warrant, permitting the lawful search of the residence.

¶ 42    In sum, at every stage of the investigation—from the initial removal of the target package and the drug dog sniff at the FedEx facility through each search and seizure conducted pursuant to valid and lawfully obtained warrants—law enforcement officers complied with the requirements of the Fourth Amendment. Accordingly, Defendant's challenge is overruled.

¶ 43    However, even assuming, *arguendo*, that Defendant's Fourth Amendment rights were sufficiently implicated to vest him with standing to raise these arguments, we additionally conclude that he has waived appellate review of these issues.

### 4. *Waiver of Appellate Review*

¶ 44    Rule 10(a)(1) of the North Carolina Rules of Appellate Procedure establishes that a party must object at trial, and obtain a ruling from the court, in order to preserve an issue for appellate review:

> In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.

N.C.R. App. P. 10(a)(1).

¶ 45    A motion in limine, such as a pretrial motion to suppress, is "not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not

object to that evidence at the time it is offered at trial." *State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Following the denial of a pretrial motion to suppress evidence, the defendant's subsequent "[f]ailure to object at trial waives appellate review[.]" *State v. Anthony*, 271 N.C. App. 749, 752, 845 S.E.2d 452, 455, *disc. review denied*, 376 N.C. 544, 851 S.E.2d 634 (2020).

¶ 46 Here, Defendant filed a pretrial motion to suppress, *inter alia*, "evidence obtained as the result of an unconstitutional seizure of the [target package] addressed to . . . Defendant," and renewed his objection at trial to the introduction of evidence concerning the drug dog sniff. Nonetheless, Defendant concedes that he "did not object when the State elicited testimony about the removal of the [target package] from the conveyor belt." Therefore, Defendant has waived appellate review of the issue of the target package's removal from the conveyor belt, *see id.*, and the trial court's conclusion that "a reasonable and articulable suspicion existed sufficient to justify a brief detention of the package for purposes of having a drug dog sniff it" remains undisturbed.

¶ 47 Perhaps in an attempt to avoid this waiver, Defendant couches his dog-sniff argument in the conjunctive, combining the drug dog sniff with the alleged "seizure" of the target package from the conveyor belt: "such actions *plus* the conducting of a lineup with a narcotics-detecting canine constituted a search[.]" (Emphasis added).

This argument fails.

Despite the fact that Defendant objected at trial to the introduction of evidence regarding Hydro's drug sniff of the target package once it was removed from the conveyor belt, this subsequent objection cannot overcome Defendant's failure to object to the State's initial introduction of Investigator Menzie's testimony regarding the removal of the target package itself—the alleged "seizure" that Defendant has consistently characterized as the initial Fourth Amendment violation. Moreover, Defendant's subsequent objection at trial to the introduction of evidence regarding the drug dog sniff cannot preserve Defendant's broader Fourth Amendment arguments for appellate review because the drug dog sniff, on its own, did not infringe on Defendant's Fourth Amendment rights.

Defendant primarily bases his argument concerning the drug dog sniff on *Florida v. Jardines*, in which the United States Supreme Court concluded that "the officers' investigation took place in a constitutionally protected area"—the front porch of the defendant's home—and held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." 569 U.S. 1, 7, 11–12, 185 L. Ed. 2d 495, 501–02, 504 (2013).

In analogizing the target package in this case to the front door of the home in *Jardines,* Defendant disregards extensive precedent according a person's home

heightened Fourth Amendment protection. *Id.* at 6, 185 L. Ed. 2d at 501 ("[W]hen it comes to the Fourth Amendment, the home is first among equals."). In fact, the *Jardines* Court explicitly distinguished a warrantless drug dog sniff of the home and its immediate surroundings from previous decisions involving warrantless drug dog sniffs in public places, which the Supreme Court determined did not implicate the defendants' constitutional expectations of privacy in their property or effects. *Id.* at 10–11, 185 L. Ed. 2d at 503–04; *see also Illinois v. Caballes*, 543 U.S. 405, 409, 160 L. Ed. 2d 842, 847 (2005) (concluding that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests"); *Place*, 462 U.S. at 707, 77 L. Ed. 2d at 121 (concluding that the "exposure of [the] respondent's luggage, which was located in a public place, to a trained canine . . . did not constitute a 'search' within the meaning of the Fourth Amendment").

¶ 51    The *Jardines* Court focused on the physical intrusion of the defendant's "home and its immediate surroundings" rather than any violation of his reasonable expectation of privacy. 569 U.S. at 11, 185 L. Ed. 2d at 504 ("[W]e need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under *Katz* [*v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576 (1967)]. . . . That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

¶ 52    As our Supreme Court has explained, *Jardines* presents an exception to the

"generally permissive view of public dog sniffs under the Fourth Amendment." *State v. Miller*, 367 N.C. 702, 708, 766 S.E.2d 289, 293 (2014). Insofar as the relevant decisions of the United States Supreme Court "*encourage police to utilize dog sniffs in the public sphere,*" the Court's decision in *Jardines* "places police on a much shorter leash when employing dog sniffs *in and around the home.*" *Id.* (emphases added).

¶ 53        In the present case, however, Defendant can claim no physical intrusion analogous to that in *Jardines*, because the drug dog sniff in question did not occur at his home or within its immediate surroundings. Instead, the drug dog sniff here is precisely in line with the sort of investigation in the "public sphere" that our Supreme Court noted was "encourage[d]" by the United States Supreme Court's pre-*Jardines* opinions. *Id.*

¶ 54        We conclude that the drug dog sniff of the target package, which occurred on the grounds of a private, third-party facility at which Defendant was not present and in which he claimed no property interest, did not implicate any Fourth Amendment right in and of itself. Further, at the time of these events, Defendant was unaware of either the drug dog sniff or the temporary retention of the target package that precipitated the sniff. Lastly, as previously discussed, the target package was only detained for a brief period of time, which was insufficient to implicate Defendant's Fourth Amendment rights. *See Van Leeuwen*, 397 U.S. at 253, 25 L. Ed. 2d at 286.

¶ 55        Accordingly, the warrantless drug dog sniff of the target package, still in the

mail stream and in the custody of a third party on the grounds of a facility in which Defendant had no possessory interest, and which the trial court found only "took about five to ten minutes[,]" did not in and of itself implicate the Fourth Amendment. Therefore, Defendant's renewed objection at trial to the introduction of evidence concerning the drug dog sniff was insufficient to resurrect any prior unpreserved Fourth Amendment argument for appellate review.

### 5. *Plain Error*

Finally, "out of an abundance of caution," Defendant contends that the trial court's denial of his motion to suppress "constituted plain error necessitating reversal." However, "[t]he first step under plain error review is . . . to determine whether any error occurred at all." *State v. Oxendine*, 246 N.C. App. 502, 510, 783 S.E.2d 286, 292, *disc. review denied*, 368 N.C. 921, 787 S.E.2d 24 (2016). We have already determined that Defendant lacks standing to assert *any* Fourth Amendment error, let alone plain error, and that even assuming his Fourth Amendment rights were implicated and Defendant had standing to bring these arguments, he has waived appellate review of them. Accordingly, Defendant's plain error arguments are overruled as well.

Moreover, in reaching these determinations, we have carefully reviewed the evidence at the suppression hearing. We further conclude that the trial court's findings of fact are supported by the evidence, and that those findings, in turn,

support the trial court's conclusions of law and its denial of Defendant's motion to suppress. For all of these reasons, we affirm the denial of Defendant's motion to suppress.

## B. Industrial Hemp

¶ 58    The majority of Defendant's remaining issues on appeal stem from our General Assembly's legalization of industrial hemp. "Industrial hemp is a variety of the species Cannabis Sativa—the same species of plant as marijuana. The difference between the two substances is that industrial hemp contains very low levels of [THC], which is the psychoactive ingredient in marijuana." *Parker*, 277 N.C. App. 531, 2021-NCCOA-217, ¶ 27. Our General Statutes define "industrial hemp" as "[a]ll parts and varieties of the plant Cannabis sativa (L.), cultivated or possessed by a grower licensed by the [North Carolina Industrial Hemp] Commission, whether growing or not, that contain a [THC] concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis." N.C. Gen. Stat. § 106-568.51(7) (2021).[6]

---

[6] In order to maintain the legal status of "hemp" and "hemp products," *see* N.C. Gen. Stat. § 90-87(13a)–(13b) (2022), following the expiration of the Industrial Hemp Act on 30 June 2022, our General Assembly amended the North Carolina Controlled Substances Act effective 30 June 2022, *see* An Act to Conform the Hemp Laws with Federal Law by Permanently Excluding Hemp from the State Controlled Substances Act, S.L. 2022-32, https://www.ncleg.gov/EnactedLegislation/SessionLaws/PDF/2021-2022/SL2022-32.pdf. Nonetheless, as a general rule, "the amendment of a criminal statute does not affect the prosecution or punishment of a crime committed before the amendment becomes effective[.]" *State v. Hart*, 287 N.C. 76, 81, 213 S.E.2d 291, 295 (1975) (citation omitted). Thus, "as to such crimes the original statute remains in force." *Id.* (citation omitted). Because the Industrial

¶ 59        Defendant maintains that the passage of the Industrial Hemp Act altered the legal landscape surrounding marijuana and THC, changes which resulted in prejudicial errors during several stages of his prosecution. Specifically, Defendant challenges: (1) the validity of the indictment charging him with possession with intent to sell or deliver THC; (2) the sufficiency of the State's evidence regarding the charge of possession with intent to sell or deliver THC; and (3) the admissibility of the opinion testimony of witnesses for the State identifying the various seized substances as "marijuana," "marijuana wax," "shatter," and "highly concentrated THC."

¶ 60        We note initially that at the root of these arguments is a fundamental misapprehension concerning the State's burden of proof at each stage of these proceedings, none of which the provisions of the Industrial Hemp Act affect to the degree that Defendant contends. Although our appellate courts have yet to fully address the effect of industrial hemp's legalization on the panoply of standards and procedures applicable during the various stages of a criminal investigation and prosecution for acts involving marijuana, *see Parker*, 277 N.C. App. 531, 2021-NCCOA-217, ¶ 29 ("The legal issues raised by the recent legalization of hemp have yet to be analyzed by the appellate courts of this state."), the federal courts of North Carolina have considered some of these issues. We find their analyses illustrative

Hemp Act was in effect at all times relevant to this appeal, our analysis is unchanged by this recent legislation.

with regard to the enduring viability of our marijuana case law and the legal principles articulated by those precedents, despite the enactment of the Industrial Hemp Act.

¶ 61 In *United States v. Harris*, the United States District Court for the Eastern District of North Carolina explained that "the smell of marijuana alone . . . supports a determination of probable cause, even if some use of industrial hemp products is legal under North Carolina law. This is because '*only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.*'" No. 4:18-CR-57-FL-1, 2019 WL 6704996, at *3 (E.D.N.C. Dec. 9, 2019) (emphasis added) (quoting *Illinois v. Gates*, 462 U.S. 213, 235, 76 L. Ed. 2d 527, 546, *reh'g denied*, 463 U.S. 1237, 77 L. Ed. 2d 1453 (1983)).

¶ 62 Similarly, in *United States v. Brooks*, the United States District Court for the Western District of North Carolina denied a defendant's motion to suppress where, *inter alia*, the defendant argued that the odor of marijuana that the law enforcement officer detected "*could* have been from a legal source." No. 3:19-cr-00211-FDW-DCK, 2021 WL 1668048, at *4 (W.D.N.C. Apr. 28, 2021). In denying the motion to suppress, the trial court noted that the defendant cited "no relevant case law which requires a law enforcement officer to test contraband found in a vehicle based on the plain smell of marijuana." *Id.*

¶ 63 The court then explained the basis for its determination that the legalization

of industrial hemp did not alter the court's probable-cause analysis:

> Assuming, *arguendo*, hemp and marijuana smell "identical," then the presence of hemp does not make all police probable cause searches based on the odor unreasonable. The law, and the legal landscape on marijuana as a whole, is ever changing but *one thing is still true: marijuana is illegal*. To date, even with the social acceptance of marijuana seeming to grow daily, precedent on the plain odor of marijuana giving law enforcement probable cause to search has *not* been overturned. Therefore, if hemp does have a nearly identical smell to marijuana — and hemp was present — it would suggest to this court that [the law enforcement officer] was even more reasonable to believe evidence of marijuana was present.

*Id.* (first emphasis added) (footnotes omitted).

¶ 64    The reasoning and analyses of these federal cases are persuasive, and demonstrate the general shortcoming that underlies Defendant's various arguments on appeal. The passage of the Industrial Hemp Act, in and of itself, did not modify the State's burden of proof at the various stages of our criminal proceedings.[7]

---

[7] Defendant also invokes the Industrial Hemp Act to support his argument that the trial court erred by denying his motion to suppress because the green, leafy substance inside the parcel was "seized" from the target package prior to determining whether it contained an unlawful concentration of THC. However, for the reasons articulated in section II.A.3 above, to the extent that Defendant challenges the initial removal of the target package from the conveyor belt at the FedEx facility, such removal was not a "seizure" implicating his Fourth Amendment rights. And to the extent that Defendant refers to the seizure of the vacuum-sealed bags discovered inside the target package, the bags were seized pursuant to the execution of a valid, lawfully obtained search warrant and therefore did not violate Defendant's Fourth Amendment rights. Further, for the reasons articulated herein, the Industrial Hemp Act has not changed the State's burden of proof to overcome a motion to suppress.

### 1. *Sufficiency of the Indictment*

¶ 65 With the above guidance in mind, we first reject Defendant's argument that the indictment charging him with possession with intent to sell or deliver THC "was facially defective because it did not allege with particularity an offense proscribed by North Carolina law subsequent to the legalization of industrial hemp."

¶ 66 It is axiomatic that "a valid bill of indictment is essential to the jurisdiction of the trial court to try an accused for a felony." *State v. Mostafavi*, 370 N.C. 681, 684, 811 S.E.2d 138, 140 (2018) (citation omitted). While "an indictment must allege all the essential elements of the offense endeavored to be charged, . . . an indictment couched in the language of the statute is generally sufficient to charge the statutory offense[.]" *Id.* at 685, 811 S.E.2d at 141 (citations and internal quotation marks omitted).

¶ 67 In the instant case, the challenged indictment alleged that Defendant "unlawfully, willfully and feloniously did possess with intent to sell or deliver a controlled substance, delta-9-tetrahydrocannabinol, commonly referred to as 'THC',

---

Finally, we note that this is not a case where the detectable odor of marijuana was the only suspicious fact concerning the package. The trial court's findings of fact include, *inter alia*, that the seams of the package were sealed, the phone number listed for the recipient on the target package was fictitious, the sender's address and phone number listed on the target package were fictitious, and the actual city from which the target package was sent differed from the city of origin stated on the package. We therefore need not address in this case whether the odor of marijuana alone may give rise to probable cause for the issuance of a search warrant, as the totality of the circumstances here was sufficient to give rise to probable cause. Accordingly, this argument is overruled.

which is included in Schedule VI of the North Carolina Controlled Substances Act. This act was done in violation of N.C.G.S. § 90-95(a)(1)." Defendant contends that, in light of the legalization of industrial hemp, "a cognizable criminal charge would be possession of a substance containing an unlawful quantity of the chemical compound" THC. Defendant argues that the indictment was facially defective because it failed to specifically allege that he possessed "an unlawful quantity" of THC, and thus the trial court lacked jurisdiction to enter judgment on this charge.

However, regardless of the passage of the Industrial Hemp Act, the concentration of THC is not an element of the offense of possession with intent to sell or deliver THC. The Controlled Substances Act makes it illegal to "possess with intent to manufacture, sell or deliver, a controlled substance[.]" N.C. Gen. Stat. § 90-95(a)(1). "The offense of possession with intent to sell or deliver has the following three elements: (1) possession of a substance; (2) the substance must be a controlled substance; (3) there must be intent to sell or distribute the controlled substance." *State v. Carr*, 145 N.C. App. 335, 341, 549 S.E.2d 897, 901 (2001). "Tetrahydrocannabinols"—a broader category of substances that includes THC—are Schedule VI controlled substances. N.C. Gen. Stat. § 90-94(2). Accordingly, by identifying THC as a controlled substance, the indictment at issue here was appropriately "couched in the language of the statute" and "sufficient to charge the statutory offense[.]" *Mostafavi*, 370 N.C. at 685, 811 S.E.2d at 141 (citation omitted).

¶ 69        Finally, the "plain reading of Chapter 90 reveals lawful possession of a controlled substance is not an element of the statute but rather an exception[.]" *State v. Palmer*, 273 N.C. App. 169, 169, 847 S.E.2d 449, 450 (2020). Significantly, the Industrial Hemp Act did not *remove* THC from Schedule VI of the Controlled Substances Act. *See* N.C. Gen. Stat. § 90-94(2). And if the Industrial Hemp Act creates an exception for industrial hemp or somehow alters the State's well-established burden of proof in controlled-substance prosecutions, "[i]t shall not be necessary for the State to negate any exemption or exception set forth in [the Controlled Substances Act] in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under" the Controlled Substances Act. *Id.* § 90-113.1(a). The burden of proving that a controlled substance is, in fact, lawfully possessed is borne by *the defendant. Id.*

¶ 70        Defendant has not shown that the indictment charging him with possession with intent to sell or deliver THC was fatally deficient. Accordingly, this argument is overruled.

### 2. *Motion to Dismiss*

¶ 71        Defendant next argues that the trial court erred by denying his motion to dismiss the charge of possession with intent to sell or deliver THC "because there was insufficient evidence the brown material tested by the CCBI lab contained the

requisite percentage of [THC] to be deemed an unlawful substance."[8] This argument, too, is without merit, because none of the "brown material" falls within the Industrial Hemp Act's definition of "industrial hemp."

¶ 72      This Court reviews a trial court's denial of a motion to dismiss de novo. *State v. McClaude*, 237 N.C. App. 350, 352, 765 S.E.2d 104, 107 (2014). The question for the trial court upon a defendant's motion to dismiss "is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of [the] defendant's being the perpetrator of such offense. If so, the motion is properly denied." *Id.* at 352–53, 765 S.E.2d at 107 (citation omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *Id.* at 353, 765 S.E.2d at 107 (citation omitted).

¶ 73      As stated above, for the purposes of the Industrial Hemp Act, "industrial hemp" means "[a]ll parts and varieties of the plant Cannabis sativa (L.), cultivated or

---

[8] At trial, the State's forensic chemist testified that she tested one item ("11 sheets of shatter") of the several items of brown material that were submitted to her lab at the City-County Bureau of Investigation. She testified that she only tested this item because there is no statutory "weight-based threshold for . . . THC," and that it is "fairly common in most crime labs to test to [the] statutory threshold in terms of efficiency." *See* N.C. Gen. Stat. § 90-95(d)(4) (making the possession "of *any* quantity of . . . tetrahydrocannabinols isolated from the resin of marijuana" a Class I felony (emphasis added)).

possessed by a grower licensed by the [North Carolina Industrial Hemp] Commission, whether growing or not, that contain a [THC] concentration of not more than three-tenths of one percent (0.3%) on a dry weight basis." N.C. Gen. Stat. § 106-568.51(7).

¶ 74          Defendant's claim—that "[w]ithout determining the level of concentration of [THC] in the brown substance, the State did not present any evidence that the brown substance actually contained 0.3% or more of [THC] and was thus illegal"—assumes, without explicitly arguing, that the "brown material" was "industrial hemp," as defined by N.C. Gen. Stat. § 106-568.51(7), in the first place. We disagree.

¶ 75          The brown material was neither a *part* nor a *variety* of the plant Cannabis sativa. The State's forensic chemist, who was tendered and accepted as an expert witness without objection from Defendant, testified that "[t]here was no plant material present" in her macroscopic identification of the solid brown material. The forensic chemist also testified that the brown materials were "extracts of the marijuana plant[.]" Thus, the brown material is not within the Industrial Hemp Act's definition of "industrial hemp," but instead more squarely falls under its definition of "THC": "[t]he natural or synthetic equivalents of the substances contained in the plant, or in the *resinous extractives* of, cannabis, or any synthetic substances, compounds, salts, or derivatives of the plant or chemicals and their isomers with similar chemical structure and pharmacological activity." *Id.* § 106-568.51(8) (emphasis added). Further, even if we accepted Defendant's implicit argument that

the brown material *was* a "part" or "variety" of the plant Cannabis sativa, Defendant makes no argument that he was "a grower licensed by the [North Carolina Industrial Hemp] Commission," or that the brown material was cultivated by such a licensed grower, as the statutory definition of "industrial hemp" requires. *Id.* § 106-568.51(7).

¶ 76        Because the brown material was not "industrial hemp" as defined by the Industrial Hemp Act, the State was not required to present evidence that the substance contained 0.3% or more of THC by dry-weight concentration in order to meet its burden of proof for the offense of possession with intent to sell or deliver THC.

¶ 77        Accordingly, after careful review of the record, and viewing the evidence "in the light most favorable to the State," *McClaude*, 237 N.C. App. at 353, 765 S.E.2d at 107 (citation omitted), we conclude that the State presented sufficient evidence to withstand Defendant's motion to dismiss the charge of possession with intent to sell or deliver THC.[9] This argument is overruled.

_____

[9] Defendant's argument concerning the sufficiency of the evidence to support the charge of possession with intent to sell or deliver THC dovetails with his argument, addressed below, concerning the allegedly erroneous admission of testimony identifying the seized materials as unlawful controlled substances absent scientifically valid chemical analyses in violation of Rule 702. To the extent that Defendant's Rule 702 argument bears on his motion to dismiss argument, we note that our Supreme Court has recently clarified that it would be error for this Court to first determine "whether the evidence suffices to support a defendant's criminal conviction by ascertaining whether the evidence relevant to the issue of the defendant's guilt should or should not have been admitted[,]" and then to consider "whether the admissible evidence, examined without reference to the allegedly inadmissible evidence

### 3. *Opinion Testimony*

¶ 78    Lastly, Defendant argues that the trial court erred by permitting several of the State's witnesses to offer opinion testimony that seized substances were "marijuana," "marijuana wax," "shatter," and "highly concentrated THC" without scientifically valid chemical analyses identifying them as such, in violation of Rule 702.

¶ 79    Our appellate courts "review the trial court's decision to admit lay opinion testimony evidence for abuse of discretion, looking to whether the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Delau*, 2022-NCSC-61, ¶ 29 (citation omitted). Further, in order to show that the erroneous admission of evidence in a criminal trial prejudiced the defendant, the "defendant bears the burden of showing that there is a reasonable possibility that a different result would have been reached at the trial had the trial court excluded" the erroneously admitted evidence. *State v. Carter*, 237 N.C. App. 274, 284, 765 S.E.2d 56, 63 (2014) (citation and internal quotation marks omitted); N.C. Gen. Stat. § 15A-1443(a). For the reasons that follow, we conclude that Defendant has not shown prejudicial error.

---

that the trial court allowed the jury to hear, sufficed to support the defendant's conviction." *State v. Osborne*, 372 N.C. 619, 630, 831 S.E.2d 328, 336 (2019). Accordingly, pursuant to our Supreme Court's guidance in *Osborne*, we cannot and should not exclude the challenged identification testimony from our consideration of the evidence supporting Defendant's convictions. *Id.*

¶ 80    "[T]he State has the burden of proving every element of the charge beyond a reasonable doubt . . . ." *State v. Nabors*, 365 N.C. 306, 313, 718 S.E.2d 623, 627 (2011). Specifically, in prosecutions involving controlled substances, the State bears the burden of proving the substance's identity beyond a reasonable doubt. *State v. Ward*, 364 N.C. 133, 147, 694 S.E.2d 738, 747 (2010). As a general rule, "the expert witness testimony required to establish that . . . substances introduced [at trial] are in fact controlled substances must be based on a scientifically valid chemical analysis and not mere visual inspection." *Id.* at 142, 694 S.E.2d at 744.

¶ 81    However, marijuana has long been excepted from this rule. Notwithstanding *Ward*, this Court has "specifically noted that marijuana is distinguishable from other controlled substances that require more technical analyses for positive identification. In keeping with a long line of cases, we [have repeatedly] held . . . that the State is not required to submit marijuana for chemical analysis." *State v. Mitchell*, 224 N.C. App. 171, 179, 735 S.E.2d 438, 444 (2012) (citation omitted), *appeal dismissed and disc. review denied*, 366 N.C. 578, 740 S.E.2d 466 (2013).

¶ 82    Nevertheless, Defendant argues that "the legalization of industrial hemp in North Carolina has eviscerated th[e] justification" for the marijuana exception recognized in *Mitchell* and other cases. Yet assuming, *arguendo*, that the trial court abused its discretion in admitting this testimony, Defendant fails to demonstrate that he was prejudiced by its admission.

¶ 83        As the State observes, "Defendant makes no argument explaining how or for which convictions that evidence affected the jury's verdict." To be sure, Defendant's assertion of prejudice is little more than a general recapitulation of his overall arguments regarding the Industrial Hemp Act. For example, Defendant claims that "the State failed to produce any evidence that the substances seized in the storage unit, in the bag [Defendant] carried at the storage unit, or in the residence were subjected to a valid scientific chemical analysis that confirmed their percentage of" THC. Thus, Defendant contends that the testimony from Investigator Menzie, Officer Smith, and Sergeant Wright "that, in their opinion, such substances were 'marijuana,' 'marijuana wax,' 'shatter,' or 'highly concentrated THC,' constituted the State's most compelling evidence that [Defendant] was guilty of possessing the alleged substances in question." Accordingly, if the "most compelling evidence" of Defendant's guilt was erroneously admitted, then that admission must have been prejudicial. We disagree with Defendant's contention.

¶ 84        First, as Defendant candidly acknowledges, the green, leafy substance in the target package *was* tested, and the substance was determined to contain an unlawful concentration of THC. Defendant, therefore, could not have been prejudiced by any erroneously admitted testimony regarding the green, leafy substance found in the target package because "a scientifically valid chemical analysis" *was* conducted with respect to this substance. *Ward*, 364 N.C. at 142, 694 S.E.2d at 744.

¶ 85   Second, as discussed above, the brown material was not "industrial hemp" as defined in the Industrial Hemp Act. As such, the State was not required to present evidence of the concentration of THC present in the brown material; it needed only present "a scientifically valid chemical analysis" showing that the brown material contained THC, *id.*, which the State did. Therefore, Defendant could not have been prejudiced by any erroneously admitted testimony identifying the brown material.

¶ 86   Lastly, although the green, leafy substance discovered in the storage unit was not tested for its concentration of THC, the State presented overwhelming evidence of Defendant's guilt of the offense of possession with intent to sell or deliver marijuana, such that any erroneously admitted testimony regarding its identification could not have reasonably affected the jury's verdict on this charge. Significantly, as discussed below, the State presented substantial evidence of Defendant's participation in a conspiracy to traffic marijuana—a conspiracy that culminated in the discovery of approximately $153,000.00 worth of "high quality" marijuana inside the target package, which was addressed to Defendant at Defendant's residence. The State also presented a scientifically valid chemical analysis showing that the green, leafy material discovered in the target package contained an unlawful concentration of THC. Further, the State presented evidence of Defendant's unlawful possession of various other controlled substances and drug paraphernalia, which law enforcement officers recovered from four distinct sources: the target package; the storage unit (to

which the officers gained entry pursuant to a lawful search warrant by use of Defendant's key and with his cooperation); a bag in Defendant's possession when he arrived at the storage unit, in which some of the brown material was in plain view when he set down the bag at the request of a law enforcement officer; and his residence.

¶ 87      For the foregoing reasons, and in light of the substantial and overwhelming evidence of Defendant's guilt, we conclude that Defendant has not shown "that there is a reasonable possibility that a different result would have been reached at the trial had the trial court excluded" any erroneously admitted testimony regarding the identification of any untested substances. *Carter*, 237 N.C. App. at 284, 765 S.E.2d at 63 (citation and internal quotation marks omitted). Defendant's argument is overruled.[10]

---

[10] Defendant also argues that the trial court committed plain error by admitting evidence concerning the chemical analysis of the green, leafy substance discovered in the target package when individuals involved in allegedly critical stages of that analysis did not testify, which Defendant contends violated his constitutional right to confront witnesses against him. However, "plain error review in North Carolina is normally limited to instructional and evidentiary error." *State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012). "Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Lloyd*, 354 N.C. 76, 86–87, 552 S.E.2d 596, 607 (2001). Defendant acknowledges that he did not preserve this issue by objecting to the testimony regarding the analysis or testing of the substances in this case, nor did he object to the admission of the written certificate of analysis into evidence. Moreover, Defendant did not seek to introduce at trial the testimony of any of the "numerous individuals involved in critical stages of the testing process"—none of whom signed the certificate of analysis admitted into evidence at trial. These are the individuals that Defendant now complains he constitutionally should

### C. Conspiracy

¶ 88      Defendant next argues that the trial court erred by denying his motion to dismiss the charge of conspiracy to traffic marijuana by transportation, due to insufficient evidence of a conspiracy between him and another. Additionally, Defendant contends that the trial court erroneously and prejudicially admitted into evidence the recording of a phone call between Investigator Menzie and "Marcus," the shipper of the target package. Defendant's arguments are without merit.

#### 1. *Motion to Dismiss*

¶ 89      The elements of a criminal conspiracy are well established:

> A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means. To constitute a conspiracy, it is not necessary that the parties should have come together and agreed in express terms to unite for a common object: A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense.

*State v. Chavez*, 378 N.C. 265, 2021-NCSC-86, ¶ 14 (citation omitted).

¶ 90      Significantly, "[t]he conspiracy is the crime and not its execution. Therefore, no overt act is necessary to complete the crime of conspiracy. As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed."

---

have been able to confront. This asserted error is based upon a constitutional right, and is not squarely an evidentiary error; thus, plain error review is not available and this argument is dismissed.

*Id*. (citation omitted).

¶ 91        The State may establish the existence of a conspiracy "by direct or circumstantial evidence." *Id.* (citation omitted). Indeed, direct evidence is not essential to proving a conspiracy, for such proof "is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *Id.* (citation omitted).

¶ 92        As stated above, we review de novo a trial court's denial of a criminal defendant's motion to dismiss. *McClaude*, 237 N.C. App. at 352, 765 S.E.2d at 107.

¶ 93        Here, Defendant argues that "the State lacked evidence of any communication or planning between [himself] and another person that could sufficiently prove an agreement or understanding to traffic marijuana." According to Defendant, "[t]he State's evidence, at best, raised the suspicion of a possible association between [Defendant] and the shipper of the [target package], but that was not enough to submit this charge to the jury." Defendant asserts that the State's case "essentially rested on the fact that 'Joe Teague' was the addressee listed on the" target package. Yet in a separate evidentiary challenge, Defendant also asserts that the trial court erroneously admitted into evidence the recording of a phone call between Investigator Menzie and Marcus. Although seemingly irrelevant to the question at hand, Defendant's evidentiary argument nevertheless implicitly acknowledges that the

State did, in fact, present additional evidence—more than just the shipping label—to establish the existence of a conspiracy.

¶ 94 Indeed, the State proffered other circumstantial evidence in support of the existence of a conspiracy in addition to the recording of the phone call between Investigator Menzie and Marcus. For example, Investigator Menzie testified that he estimated the street value of the "high quality" marijuana contained in the target package to be approximately $153,000.00. We agree with the State that such evidence creates "a strong inference that Marcus did not simply randomly mail the [target package] to Defendant but instead that he mailed it because Defendant agreed to accept it." *See id.* at 353, 765 S.E.2d at 107 (explaining that the State is entitled to "the benefit of every reasonable inference" and the resolution of "any contradictions in its favor" on appellate review of the denial of a defendant's motion to dismiss (citation omitted)). Additionally, Marcus shipped this valuable parcel from California to Defendant's address using Defendant's actual name and packed a GPS tracker within the target package. Viewed "in the light most favorable to the State," *id.* (citation omitted), these facts further indicate a mutual concern for and interest in the target package.

¶ 95 Moreover, the recorded phone call itself—which was not erroneously admitted, for the reasons discussed below—constitutes additional circumstantial evidence supporting the existence of a conspiracy. As detailed in Investigator Menzie's search-

warrant application for Defendant's mobile phone, a FedEx employee informed Investigator Menzie that Marcus called FedEx to inquire about the target package's status, requested a return call when the package was located, and left his phone number. In the affidavit supporting his search-warrant application, Investigator Menzie averred that:

> I called the number and spoke with "Marcus" who confirmed the tracking number of his parcel, the address it was going [to] and the name of the recipient. The information he provided was the same information listed on the [target package] intercepted. After obtaining that information, I identified myself to him and informed him I had his parcel in my custody. Marcus said, "F[\*\*\*]" and hung up.

"[T]aken collectively," Marcus's recorded admission to Investigator Menzie that he sent the target package, his knowledge of its relevant details, his documented concern for the package's apparent failure to reach its destination, and his profane exclamation upon learning that he was speaking with a law enforcement officer provide strong circumstantial evidence that "point[s] unerringly to the existence of a conspiracy." *Chavez*, 378 N.C. 265, 2021-NCSC-86, ¶ 14 (citation omitted). Defendant's argument is overruled.

### 2. *Statement of a Co-Conspirator*

Defendant also argues that the recorded phone-call audio was inadmissible hearsay, which was erroneously and prejudicially admitted into evidence. We

disagree.

### a. Standard of Review

¶ 98    "This Court conducts de novo review of the admission of evidence over a hearsay objection. An erroneous admission of hearsay necessitates a new trial only if the defendant shows that there is a reasonable possibility that without the error the jury would have reached a different result." *State v. Roberts*, 268 N.C. App. 272, 276, 836 S.E.2d 287, 291 (2019) (citations omitted), *disc. review denied*, 374 N.C. 271, 839 S.E.2d 350 (2020).

### b. Analysis

¶ 99    Rule 801 of the North Carolina Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c). "Hearsay is not admissible except as provided by statute" or by the Rules of Evidence. *Id.* § 8C-1, Rule 802. "A statement is admissible as an exception to the hearsay rule if it is offered against a party and it is . . . a statement by a co[-]conspirator of such party during the course and in furtherance of the conspiracy." *Id.* § 8C-1, Rule 801(d). The proper admission into evidence of a conspirator's statement against a co-conspirator "requires the State to establish that: (1) a conspiracy existed; (2) the acts or declarations were made by a party to it and in pursuance of its objectives; and (3) while it was active, that is, after it was formed

and before it ended." *State v. Valentine*, 357 N.C. 512, 521, 591 S.E.2d 846, 854 (2003) (citation and internal quotation marks omitted).

¶ 100        Defendant argues that the State has not satisfied any of these requirements, primarily alleging that "[s]tatements not made between the alleged co-conspirators do not satisfy the criteria for admitting hearsay under the co-conspirator exception." However, "when the State has introduced *prima facie* evidence of a conspiracy, the acts and declarations of each party to it in furtherance of its objectives are admissible against the other members *regardless* of their presence or absence at the time the acts and declarations were done or uttered." *State v. Tilley*, 292 N.C. 132, 138, 232 S.E.2d 433, 438 (1977). Accordingly, Defendant's argument that a statement must be made "between the alleged co-conspirators" in order to be admissible under the co-conspirator exception to the hearsay rule lacks merit.

¶ 101        Further, as the trial court found in ruling on Defendant's objection:

> [I]n the light most favorable to the State, the State established a conspiracy existed and that this statement was made while the conspiracy was still active, that is, after it was formed and before it was ended; that the statements were made by a party to the conspiracy, to wit, Marcus Rawls or a person purporting to be Marcus Rawls; and that it was in pursuance of its objectives in that the declarant was attempting to ensure that the [target] package was properly delivered.

¶ 102        After the trial court noted that it was "not aware of any requirement that the statement must be made to another party to the conspiracy as opposed to some third

party who is not a co-conspirator[,]" the court overruled Defendant's objection and admitted the recording of the phone call as the statement of a co-conspirator. We discern no error in the trial court's ruling.

### III.    Conclusion

For the reasons stated above, including the fact that neither the initial removal of the target package nor the drug dog sniff constituted a search or seizure implicating Defendant's Fourth Amendment rights, Defendant's corresponding lack of Fourth Amendment standing to raise these Fourth Amendment arguments, and Defendant's waiver of appellate review of his Fourth Amendment arguments concerning the initial removal of the target package from the conveyor belt, we affirm the trial court's denial of Defendant's motion to suppress.

The legalization of industrial hemp, which is reported to be indistinguishable from marijuana without quantitative chemical analysis, raises compelling legal issues for our courts. However, we conclude that Defendant's arguments in the instant case are without merit. Accordingly, these arguments are overruled.

Similarly, Defendant's arguments relating to the charge of conspiracy to traffic marijuana by transportation are unpersuasive and overruled. For all these reasons, we conclude that Defendant received a fair trial, free from prejudicial error.

AFFIRMED IN PART; NO PREJUDICIAL ERROR IN PART.

Judge DILLON concurs by separate opinion.

Judge COLLINS concurs in the result by separate opinion.

No. COA21-10 – *State v. Teague*

DILLON, Judge, concurring                    .

¶ 106            I concur in the majority opinion.  I write separately to express my view that Defendant had standing to challenge the search and seizure of the package addressed to him to the extent the Fourth Amendment was implicated, notwithstanding that he *subsequently* denied ownership of the package.  The drugs had already been discovered before Defendant was questioned as to his involvement. The "search" of the package clearly implicated Defendant's Fourth Amendment rights; however, he makes no argument that the results of the dog sniff, the suspicious labeling and manner of packaging were not sufficient to establish probable cause for the warrant.  And even assuming the removal of the package and the dog sniff itself (prior to the search) implicated the Fourth Amendment, I conclude that this brief investigatory "seizure" of the package was supported by reasonable suspicion, based on the suspicious label and manner of packaging.

COLLINS, Judge, concurring in result and writing separately.

I concur in the result reached by the majority. Because I believe Defendant has standing to challenge the law enforcement officer's removal of the package, I write separately.

The Fourth Amendment to the Constitution of the United States, as made applicable to the states through the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. This text protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983); *United States v. Knotts*, 460 U.S. 276, 280-81 (1983). "A 'seizure' of [a package possessed by a private freight carrier] occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A meaningful interference with an individual's possessory interests in the property occurs when an officer asserts "dominion and control over the package and its contents." *Id.* at 120.

"Before a defendant can assert the protection afforded by the Fourth Amendment, however, he must demonstrate that any rights alleged to have been

violated were his rights, not someone else's." *State v. Lane*, 280 N.C. App. 264, 2021-NCCOA-593, ¶ 18 (quotation marks, brackets, and citation omitted). "Standing requires *both* an ownership or possessory interest and a reasonable expectation of privacy." *Id.* ¶ 20 (citation omitted). "[T]he burden of showing this ownership or possessory interest is on the person who claims that his rights have been infringed." *State v. Rodelo*, 231 N.C. App. 660, 662, 752 S.E.2d 766, 770 (2014) (quotation marks and citation omitted).

¶ 110    The Supreme Court of the United States has long recognized that "letters and sealed packages subject to letter postage" are entitled to Fourth Amendment protection against unreasonable searches and seizures. *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970); *see also Jacobsen*, 466 U.S. at 114 ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy."); *Ex parte Jackson*, 96 U.S. 727, 733 (1878) ("Whilst in the mail, [letters and sealed packages] can only be opened and examined under like warrant . . . as is required when papers are subjected to search in one's own household."). "Both senders and recipients of letters and other sealed packages ordinarily have a legitimate expectation of privacy in those items even after they have been placed in the mail." *United States v. Rose*, 3 F.4th 722, 728 (4th Cir. 2021) (citing *Van Leeuwen*, 397 U.S. at 251); *see also United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984) (per curiam) ("It is no doubt true that, had this package been

addressed to the defendants, they would have had a legitimate expectation of privacy in its contents.").

¶ 111        In this case, the package was addressed to Defendant at his address. Accordingly, Defendant had a legitimate expectation of privacy in the package and, as the trial court correctly concluded, Defendant has standing to challenge a search and seizure of that package.