IN THE SUPREME COURT OF NORTH CAROLINA

No. 368PA13

Filed 19 December 2014

STATE OF NORTH CAROLINA

v.

MICHAEL PAUL MILLER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 746 S.E.2d 421 (2013), reversing judgments entered on 23 May 2011 by Judge Joseph N. Crosswhite in Superior Court, Rowan County, and remanding the case to the trial court to resolve a conflict in the evidence relating to defendant's motion to suppress and for additional proceedings. Heard in the Supreme Court on 8 September 2014.

*Roy Cooper, Attorney General, by Martin T. McCracken and Teresa Postell, Assistant Attorneys General, for the State-appellant.*

*Staples S. Hughes, Appellate Defender, by Kathleen M. Joyce, Assistant Appellate Defender, for defendant-appellee.*

HUNTER, Justice.

A police dog's instinctive action, unguided and undirected by the police, that brings evidence not otherwise in plain view into plain view is not a search within the meaning of the Fourth Amendment to the United States Constitution or Article I, Section 20 of the North Carolina Constitution.

**I**

In May 2009, the Spencer Police Department received a burglar alarm report indicating a possible break-in at defendant Michael Paul Miller's residence. Officer Brian Hill was the first officer to arrive at the scene. Officer Hill surveyed the exterior of the home and noticed a broken window on the back side of the house having an opening large enough for a person to gain entry into the residence. The doors of the residence were locked. Concerned that an intruder was in the house, Officer Hill called for backup and the assistance of a canine officer to perform a protective sweep.

Shortly thereafter, additional backup arrived, including Officer Jason Fox and his police dog, "Jack." Officer Hill explained the situation to Officer Fox and the two began discussing how to proceed next. As the officers were preparing to search the home, defendant's mother, Ms. Gwen Weant, arrived at the scene with a key to the house. She gave Officer Hill and Officer Fox the key, as well as permission to search the premises for intruders.

Officer Fox began the search by deploying Jack inside the house. At Officer Fox's command, Jack began methodically working his way through the house searching for intruders. Jack went from room to room until he reached a side bedroom, where he remained. Officer Fox, fearing for Jack's safety, entered the house and went to the bedroom to investigate. Jack was sitting on the bedroom floor staring at a dresser drawer, thereby alerting Officer Fox to the presence of

narcotics. Officer Fox opened the drawer and discovered a brick of marijuana. He then called for Officer Hill, who also observed the drugs. Leaving the brick of marijuana undisturbed, Officer Fox, Officer Hill, and Jack continued their protective sweep of the house. As Jack neared the back of the house, he stopped in front of a closet at the end of the main hallway and began barking at the closet door, this time alerting Officer Fox to the presence of a human suspect behind the closet door. Unlike the passive sit and stare alert that Jack used to signal for the presence of narcotics, Jack was trained to bark to signal the presence of human suspects. Officer Fox and Officer Hill drew their firearms and opened the closet door, revealing two large black trash bags on the closet floor. No intruder was found in the closet.

Each officer characterized the ensuing events somewhat differently at a later hearing held on defendant's motion to suppress. Officer Hill testified that as soon as they opened the closet door, he could see marijuana in the opening of the trash bags and that the marijuana was plainly visible. Officer Fox initially testified that he could see what appeared to be marijuana inside a partially opened bag and that he did not manipulate the bag in any way at that time. But later, on cross-examination he testified that as soon as they opened the closet door, Jack "immediately" stuck his nose inside one of the trash bags and nuzzled the bag open; Officer Fox then indicated that the marijuana was visible to him only after Jack nuzzled the bag open.

The officers did not immediately seize the marijuana. Instead, they finished their protective sweep of the house, still finding no intruders, and locked and secured the residence. Defendant arrived at the scene shortly thereafter, and, after questioning from Officer Hill, disclosed that a gun was in his vehicle. The handgun was immediately seized. Based on the information gathered by Officers Hill and Fox during their initial sweep, Sergeant Eric Ennis, an investigator for the Spencer Police Department, applied for a search warrant to recover the drugs observed in defendant's residence. When the search warrant arrived, the officers reentered defendant's home and seized the drugs.

Defendant was subsequently indicted on charges of possession with the intent to sell or deliver marijuana, maintaining a dwelling house for keeping, storing, using or selling marijuana, and carrying a handgun concealed in his vehicle. At a preliminary hearing, defendant moved to suppress all evidence seized during the search of his house, arguing that the search and seizure violated his rights under the Fourth Amendment to the United States Constitution and Article I, Section 20 of the North Carolina Constitution.

After considering the testimonies of Officer Hill, Officer Fox, and Sergeant Ennis, as well as other documentary exhibits offered into evidence, the trial court entered an order granting defendant's motion in part and denying the motion in part. With respect to the brick of marijuana seized from defendant's dresser drawer, the trial court found that "the officers deviated from the . . . search [for

intruders] when they opened" the drawer. Consequently, the trial court found that defendant's constitutional rights were violated by that action and ordered that this evidence be suppressed; however, with respect to the marijuana seized from the trash bags in the hall closet, the trial court denied defendant's motion. The trial court recognized the conflict between the testimonies of Officers Hill and Fox regarding whether the marijuana was in plain view before Jack nuzzled into the trash bag, but, rather than resolving the conflict, summarily found that the discovery of the marijuana in the closet did not violate defendant's constitutional rights. Defendant entered an *Alford* plea of guilty to all charges while reserving the right to appeal the trial court's decision allowing the marijuana seized from the closet into evidence. Defendant then appealed the order and subsequent judgments to the Court of Appeals.

The Court of Appeals reversed the judgments and remanded the case to the trial court for further proceedings. *State v. Miller*, ___ N.C. App. ___, 746 S.E.2d 421 (2013). Citing *Arizona v. Hicks*, 480 U.S. 321, 324-25 (1987), the Court of Appeals concluded that "Jack was an instrumentality of the police, and his actions, regardless of whether they are instinctive or not, are no different than those undertaken by an officer. If he opened the bags and exposed the otherwise hidden marijuana, it would not be admissible under the plain view doctrine." *Miller*, ___ N.C. App. at ___, 746 S.E.2d at 427. In reaching its holding, the Court of Appeals rejected persuasive precedent from two federal circuit courts of appeal that had

rejected Fourth Amendment challenges by defendants under analogous factual circumstances. *Id.* at \_\_\_, 746 S.E.2d at 426; s*ee United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998); *United States v. Lyons*, 957 F.2d 615, 617 (8th Cir. 1992). But, because the trial court failed to resolve in its order whether the marijuana was in plain view without Jack's nuzzling of the bags, the Court of Appeals remanded the question to the trial court with instructions to suppress the evidence if the trial court found that Jack brought the marijuana into plain view. *Miller*, \_\_\_ N.C. App. at \_\_\_, 746 S.E.2d at 427.

On a petition for discretionary review to this Court, we ordered briefing and argument on the following question submitted by the State: "Did the Court of Appeals err by holding that the canine was an instrumentality of the police and his actions, whether instinctive or not, are no different than those undertaken by an officer?"

As formulated, the question presented focuses on two discrete inquiries: (1) whether Jack was an instrumentality of the police, and (2) whether Jack's actions are analytically different under the Fourth Amendment or Article I, Section 20 from similar actions performed by the police. With respect to the first inquiry, the "instrumentality" question implies that a material issue in this case is whether Jack was a State actor for the purpose of invoking the Fourth Amendment. We note that a police dog assisting officers in the search of a home for intruders is clearly acting as an instrumentality of the police. *See Coolidge v. New Hampshire*, 403 U.S.

443, 487 (1971) (concluding that instruments and agents of the State are State actors for Fourth Amendment purposes), *abrogated in part on other grounds by Horton v. California*, 496 U.S. 128 (1990). Therefore, whether Jack was a State actor is not the issue here. Rather, the dispositive issue in this case is whether Jack's actions are analytically different under the Fourth Amendment or Article I, Section 20 from similar actions performed by the police. Stated precisely, we must decide whether a police dog's instinctive action, unguided and undirected by the police, that brings evidence not otherwise in plain view into plain view is a search within the meaning of the Fourth Amendment or Article I, Section 20 of the North Carolina Constitution.

## II

The Fourth Amendment states in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Our State's analogous constitutional provision, Article I, Section 20, declares that "[g]eneral warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20. In construing these analogous provisions together, we have held that nothing in the text of Article I, Section 20 calls for broader protection than that of the

Fourth Amendment. *State v. Garner*, 331 N.C. 491, 506-07, 417 S.E.2d 502, 510 (1992). Accordingly, our Article I, Section 20 jurisprudence generally comports with the Supreme Court of the United States' interpretation of the Fourth Amendment.

**A**

Man's best friend is no stranger to Fourth Amendment jurisprudence. The Supreme Court of the United States has decided several cases involving police dog sniffs that indicate the extent to which police may use these four-legged crime-fighters without running afoul of constitutional safeguards. In *United States v. Place*, 462 U.S. 696, 707 (1983), the Court concluded that a dog sniff of a person's luggage in a public place (an airport) is not a "search" within the meaning of the Fourth Amendment. In reaching its decision, the Court acknowledged that "a person possesses a privacy interest in the contents of personal luggage," but supported its conclusion by noting that a dog sniff for the purpose of identifying the presence of narcotics is "*sui generis*," that is, unique in the sense that "the sniff discloses only the presence or absence of narcotics, a contraband item." *Id.* Focusing on the intrusiveness of the dog's action, the Court stated that a dog sniff for narcotics conducted in a public place

> does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. . . . Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is

> not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

*Id.* By drawing a contrast between a "canine sniff" and other conduct that may "expose noncontraband items that otherwise would remain hidden from public view," the Court in *Place* limited its permissive holding to sniffs that can reveal no more than the presence of contraband.

The applicability of the holding in *Place* in other factual contexts has since been confirmed in *City of Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000), and *Illinois v. Caballes*, 543 U.S. 405, 408-10 (2005). In *Edmond* the Court stated that a dog sniff of the exterior of a vehicle stopped at a highway checkpoint "does not transform the seizure into a search." 531 U.S. at 40 (citing *Place*, 462 U.S. at 707). The Court explained, "Just as in *Place*, an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics." *Id.* In *Caballes* the Court observed that "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." 543 U.S. at 410. The Court reasoned that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.' " *Id.* at 408 (citation omitted). Taken

together, these cases stand for a generally permissive view of public dog sniffs under the Fourth Amendment.

Nonetheless, insofar as *Place*, *Edmond*, and *Caballes* encourage police to utilize dog sniffs in the public sphere, the Court's recent decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), places police on a much shorter leash when employing dog sniffs in and around the home. In *Jardines* police brought a drug-sniffing dog onto the defendant's front porch, where the dog alerted to the presence of narcotics at the defendant's front door. *Id.* at 1413. Police used the dog's positive alert to obtain a warrant to search the residence for narcotics. *Id.* Delivering the opinion of the Court, Justice Scalia emphasized that "the officers learned what they learned only by physically intruding on Jardines' property to gather evidence," which "is enough to establish that a search occurred." *Id.* at 1417. Noting that the home is "first among equals" when it comes to the Fourth Amendment, *id.* at 1414, the Court stated that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment," *id.* at 1417-18.

While each of these cases is instructive on the question presented here, each falls short of being determinative. First, unlike the abovementioned cases, Jack's action here is not properly classified as a dog "sniff," but rather a dog "nuzzle." While Jack likely sniffed the marijuana in defendant's closet, it is his nuzzling of the trash bags that has triggered the Fourth Amendment inquiry at issue here.

-10-

Second, although Jack was in the privacy of defendant's home when he nuzzled the bags, the exigency of the situation meant that the officers and Jack were lawfully in the house and in front of the open closet searching for intruders.

Although the case did not involve a dog, the Court of Appeals believed that *Arizona v. Hicks* was determinative of the question presented by defendant's Fourth Amendment challenge. In *Hicks* a bullet was fired through the floor of the defendant's apartment, injuring a man in the apartment below. 480 U.S. at 323. Police entered the defendant's apartment to search for the shooter, for other victims, and for weapons. *Id.* During the search, one of the officers noticed expensive stereo equipment that "seemed out of place in the squalid and otherwise ill-appointed four-room apartment." *Id.* The officer read and recorded the serial numbers of the items, moving some of the equipment to do so. *Id.* Upon confirmation that the items were stolen, the equipment was seized. *Id.* In analyzing whether the officer's movement of the equipment to read the serial numbers constituted a Fourth Amendment search, the Court stated that

> taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of [the defendant's] privacy unjustified by the exigent circumstance that validated the entry. . . . It matters not that the search uncovered nothing of any great personal value to [the defendant]—serial numbers rather than (what might conceivably have been hidden behind or under the equipment) letters or photographs. A search is a search, even if it happens to disclose nothing but the bottom of a turntable.

*Id.* at 325.

Analogizing the officer's actions in *Hicks* to Jack's actions here, the Court of Appeals determined that Jack's nuzzling of the bags was an action " 'unrelated to the objectives of the authorized intrusion' " that created " 'a new invasion of [defendant's] privacy unjustified by the exigent circumstance that validated the entry.' " *Miller*, ___ N.C. App. at ___, 746 S.E.2d at 427 (quoting *Hicks*, 480 U.S. at 325). To bridge the gap between an officer's action in *Hicks* and a dog's action here, the Court of Appeals stated, without authority, that "Jack was an instrumentality of the police, and his actions, regardless of whether they are instinctive or not, are no different than those undertaken by an officer." *Id.* at ___, 746 S.E.2d at 427. The problem with this analogy, however, is that Jack's actions *are* different from the actions of an officer, particularly if the dog's actions were instinctive, undirected, and unguided by the police.

**B**

Several federal circuit courts of appeal have recognized the distinction between an officer's actions and the instinctive actions of a police dog, albeit in imprecise terms. *See, e.g.*, *United States v. Sharp*, 689 F.3d 616, 618-20 (6th Cir.), *cert. denied*, 133 S. Ct. 777 (2012); *United States v. Pierce*, 622 F.3d 209, 212-15 (3d Cir. 2010); *United States v. Vazquez*, 555 F.3d 923, 930 (10th Cir.), *cert. denied*, 558 U.S. 903 (2009); *Lyons*, 957 F.2d at 616-17. The most common factual scenario

encountered in the federal circuits has occurred when a lawful traffic stop takes place; a police dog is used to perform a sniff around the exterior of the vehicle; and the dog, without prompting, jumps into an open window or door and alerts to the presence of narcotics *inside* the suspect's car. For example, in one of the first cases to address this type of situation, *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989), a police dog jumped into a vehicle's hatchback that had been opened by the defendant during a traffic stop. *Id.* at 361. The court stated that "[e]ven though the police could use a trained dog to sniff the exterior of Stone's automobile, the dog created a troubling issue under the Fourth Amendment when it entered the hatchback." *Id.* at 363. The court acknowledged that people have an expectation of privacy in the interiors of their automobiles, *id.*, but concluded that "the dog's instinctive actions did not violate the Fourth Amendment," *id.* at 364. The Court reasoned that

> [t]here is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback so the dog could jump in. Nor is there any evidence the police handler encouraged the dog to jump in the car. . . . In these circumstances, we think the police remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe an automobile contains narcotics.

*Id.* The rule of the case has since been articulated clearly by the Sixth Circuit in *Sharp*: "[A] dog's instinctive jump into a car does not violate the Fourth Amendment as long as the canine enters the vehicle on its own initiative and is

neither encouraged nor placed into the vehicle by law enforcement." 689 F.3d at 619 (citations omitted). In defining what an "instinctive" act is, *Sharp* noted that " 'instinctive implies the dog enters the car without assistance, facilitation, or other intentional action by its handler.' " *Id.* (quoting *Pierce*, 622 F.3d at 214). When there is, however, a desire by law enforcement to facilitate a dog sniff in the interior of the vehicle, the Fourth Amendment is implicated. *See, e.g., United States v. Winningham*, 140 F.3d 1328, 1330-31 (10th Cir. 1998) (affirming the lower court's decision invalidating a search when "the officers themselves opened the door, allowing the van to sit on the side of the highway with the sliding door wide open for a period of at least six minutes until the drug dog could arrive . . . [and] then unleashed the dog as the dog neared the open door").

The federal circuit court cases that are close to being on all fours with respect to the instant case are *United States v. Reed* and *United States v. Lyons*. In *Reed*, a Sixth Circuit decision, police responded to a possible break-in at the defendant's flat and called in a canine unit to perform a protective sweep for intruders. 141 F.3d at 646. "Cheddy," the police dog tasked with performing the search, was trained to alert for narcotics and intruders upon command. *Id.* at 647. After being commanded to search for intruders (not for drugs),

> Cheddy entered the master bedroom, and alerted on a dresser by scratching at the right-hand dresser drawers. [The officer], upon hearing the commotion, entered the master bedroom. Although it is unknown whether the dresser drawers were open before Cheddy entered the

room, apparently the dog had knocked the top drawer off
its runners and into the second drawer, which was also
open. . . . [The officer] pulled the dog away, and noticed a
bag of cocaine plainly visible in his bright mag-light
beam.

*Id.* Citing, *inter alia*, *Stone*, the court determined that "there was no illegal search in this instance, even assuming that Cheddy moved the drawers . . . because the movement of the drawers, if any, would have been occasioned by Cheddy's instinctive reactions to the nature of the contraband." *Id.* at 650.

In *Lyons* police were called to the airport to investigate a suspicious package addressed to the defendant. 957 F.2d at 615-16. "Grady," the trained police dog tasked with sniffing the package, suddenly and without prompting, "became agitated and tore the package in two, spewing the contents on the floor. The contents were white chunks which the police then field tested and determined to be cocaine." *Id.* at 616. Also citing *Stone*, the Eighth Circuit Court of Appeals concluded that "[w]ithout misconduct by the police, the mere fact that the dog tore the package does not constitute a 'search.'" *Id.* at 617.

*Lyons* is a model of precision insofar as it clearly asserts the doctrinal foundation for its holding—that the dog's instinctive actions did not constitute a Fourth Amendment search. *Id.*; *see also Pierce*, 622 F.3d at 214-15 ("[W]e apply the considerable body of jurisprudence examined above to conclude that [the dog's] interior sniffs, as a natural migration from his initial exterior sniffs, did not constitute a search requiring a warrant or probable cause."). Yet, *Lyons* and similar

cases that purport to be decided on search grounds do not engage in a prototypical search analysis (by referring to the Supreme Court's search cases and doctrine) and fail to fully articulate *why* a dog's instinctive, undirected, and unguided action does not constitute a Fourth Amendment search.

## C

The determinative question in the instant case is therefore: Whether a police dog's instinctive action, unguided and undirected by the police, that brings evidence not otherwise in plain view into plain view is a search within the meaning of the Fourth Amendment. Nipping at the heels of near uniformity in the federal circuit courts that have addressed the issue in strictly "search" terms, we hold that such action is not a search.

We reach this holding fully aware that what constitutes a "search" within the meaning of the Fourth Amendment has expanded in recent years, beginning with the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012). Before *Jones*, the Court's decision in *Katz v. United States*, 389 U.S. 347 (1967), and its progeny defined a Fourth Amendment search in terms of one's "reasonable" or "legitimate" expectation of privacy. *See generally* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1 (5th ed. 2012). The test articulated by the Court for determining whether a Fourth Amendment search occurred under the *Katz* line of cases is (1) whether "the individual manifested a subjective expectation of privacy in the object of the challenged search," and (2)

whether "society is willing to recognize that expectation as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (brackets, citation, and internal quotation marks omitted). If the answer to both inquiries is in the affirmative, then a search has occurred. *Id.*

In *Jones*, however, the Court stated that "Fourth Amendment rights do not rise or fall with the *Katz* formulation." 132 S. Ct. at 950. Harkening back to traditional property-based concepts foundational to the Fourth Amendment, the Court reintroduced the common-law "trespass" theory into the Court's Fourth Amendment jurisprudence.[1] *Id.* at 951. The Court indicated that when the government engages in a "physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Id.* (citation and quotation marks omitted). In discussing reintroduction of the trespass theory into the Court's Fourth Amendment jurisprudence, the Court stated that "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."[2] *Id.* at 952.

---

[1] *Jardines* reaffirmed application of common-law trespass theory just last year. 133 S. Ct. at 1414-17.

[2] In *Jones*, government agents attached a GPS tracking device to the undercarriage of the defendant's car while it was parked in a public place and then subsequently monitored the defendant's movements for 28 days, collecting evidence eventually supporting a criminal indictment on drug charges. 132 S. Ct. at 948. The Court held that such action constituted a search under the common-law trespass analysis. *Id.* at 949.

Important, however, in the Court's search doctrine is the prerequisite that the State or government actor have as his or her purpose a desire to find something or obtain information. "A trespass on 'houses' or 'effects,' or a *Katz* invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy." *Id.* at 951 n.5; *see also Kyllo*, 533 U.S. at 32 n.1 ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.' N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)."). This point is dispositive in this case, and is a point that inherently supports the holdings in those federal circuit court cases that have determined that a dog's instinctive, unguided, and undirected action that leads to the discovery of evidence is not a Fourth Amendment search.

If a police dog is acting without assistance, facilitation, or other intentional action by its handler (in the words of *Sharp*, acting "instinctively"), it cannot be said that a State or governmental actor intends to do anything. In such a case, the dog is simply being a dog. If, however, police misconduct is present, or if the dog is acting at the direction or guidance of its handler, then it can be readily inferred from the dog's action that there is an intent to find something or to obtain information. *See Winningham*, 140 F.3d at 1330-31 (invalidating a search on such

grounds). In short, we hold that a police dog's instinctive action, unguided and undirected by the police, that brings evidence not otherwise in plain view into plain view is not a search within the meaning of the Fourth Amendment or Article I, Section 20 of the North Carolina Constitution. Therefore, the decision of the Court of Appeals that Jack was an instrumentality of the police, regardless of whether his actions were instinctive, is reversed.

## III

As defendant indicates in his brief to this Court, the trial court has not made a finding of fact with respect to the instinctive, unguided, and undirected nature of Jack's nuzzling of the bags in this case. Defendant's brief does concede, however, that Officer Fox leashed Jack before opening the closet door and that "there is no evidence to contradict [Officer Fox's] testimony" that "he did not order Jack to sniff the bag to nudge it open." Nevertheless, our review of the trial court's suppression order is "strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). Accordingly, because we have reversed the Court of Appeals' determination that Jack was an instrumentality of the police, regardless of the instinctive nature of his actions, we remand this matter to the Court of Appeals for further remand to the trial court to resolve whether Jack's nuzzling of the bags

was instinctive, undirected, and unguided by the officers, and to enter new findings of fact and conclusions of law consistent with this opinion.

REVERSED AND REMANDED.

Justice BEASLEY did not participate in the consideration or decision in this case.