IN THE SUPREME COURT OF NORTH CAROLINA

No. 151A24

Filed 17 October 2025

STATE OF NORTH CAROLINA

v.

DEMETRIA L. NORMAN

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 293 N.C. App. 744, 901 S.E.2d 406 (2024), affirming a judgment entered on 20 September 2022 by Judge Peter B. Knight in Superior Court, Henderson County. Heard in the Supreme Court on 13 February 2025.

*Jeff Jackson, Attorney General, by Robert P. Brackett, Jr., Special Deputy Attorney General, for the State-appellee.*

*Michele A. Goldman for defendant-appellant.*

NEWBY, Chief Justice.

In this case we examine whether the trial court properly denied defendant's motion to suppress evidence obtained by law enforcement during the execution of a search warrant. Defendant contends that officers violated his Fourth Amendment rights while conducting a "knock and talk" that produced information used to apply for the search warrant. Because we conclude that probable cause supported issuance of the search warrant even in the absence of the information resulting from the contested knock and talk, we do not decide whether the officers exceeded the scope of

a permissible knock and talk. Accordingly, the decision of the Court of Appeals is modified and affirmed.

In the morning hours of 12 February 2021, officers with the Fletcher Police Department (FPD) investigated an apparent breaking and entering at Mr. Pete's Market in Fletcher, North Carolina. The perpetrators cut wires appearing to control the alarm system and pried open the doors of the store. They stole, *inter alia*, approximately $2,600 in twenty-dollar bills from a forcibly opened ATM, seven cartons of Marlboro Gold cigarettes, and numerous unopened packs of 100X The Cash lottery tickets.

On 16 February 2021, someone attempted to redeem one of the stolen lottery tickets at the Edneyville General Store in Edneyville, North Carolina, several miles from Fletcher's town limits. A lottery commission representative notified FPD Detective Sergeant Ron Diaz of this development on 17 February 2021.

Detective Diaz went to the Edneyville General Store to look at its security footage. The footage showed a black Dodge Durango with black rims and a missing front bumper park in one of the farthest spaces in the parking area. In Detective Diaz's experience, this meant that the driver was attempting to avoid cameras. The video then showed a woman in a hat and face mask exit the passenger side of the vehicle, enter the store, and attempt to cash the stolen lottery ticket. At that time, the cashier received a notice to contact the lottery commission, so the cashier declined the lottery ticket and gave it back to the woman. The woman returned to the

passenger side of the Durango, which drove out of the parking lot in the direction of Hendersonville, North Carolina.

Detective Diaz decided to drive in the same direction that the Durango had traveled. While driving, Detective Diaz scanned both sides of the road, and at a point approximately a ten-minute drive from the store, he spotted a black Durango with black rims and a missing front bumper parked in the " 'apex' of the '[U]'[-shaped]" driveway of 58 Stepp Acres Lane in Hendersonville.

Having seen the Durango's license plate from the road, Detective Diaz checked it on his vehicle's computer system and discovered it was fictitious. The Maryland license plate displayed on the Durango was issued for a 2019 Dodge Ram owned by EAN Holdings, a parent company for several rental car companies (namely, Enterprise Rent-A-Car, Alamo Rent a Car, and National Car Rental). Detective Diaz suspected that the Durango's owner was trying to conceal his identity.

Detective Diaz drove away and parked his vehicle in a different location, and he notified the Henderson County Sheriff's Office of his operations because he was in its jurisdiction. Detective Diaz then contacted the FPD to request that Lieutenant Daniel Barale join him. Once Lieutenant Barale and three Henderson County sheriff's deputies arrived at Detective Diaz's location, they all proceeded to 58 Stepp Acres Lane. Detective Diaz parked in a grass area just past the driveway to allow the other officers to park near, but not in, the driveway.

Once parked, Detective Diaz, accompanied by a deputy sheriff, went to the

front door of the residence. Lieutenant Barale and another deputy sheriff remained by the Durango in case anyone was inside it. Detective Diaz knocked on the house's door several times, but no one answered. Detective Diaz then left the front door and went directly to the rear of the Durango to confirm the license plate number and call it in to verify its fictitious nature. Dispatch confirmed the plates correlated to a 2019 Dodge Ram owned by EAN Holdings. Without touching the car or shining his light into its interior, Detective Diaz looked through the driver's window and noticed a 100X The Cash lottery ticket and a pack of Marlboro Gold cigarettes lying inside.

While Lieutenant Barale and the sheriff's deputies remained on the scene, Detective Diaz returned to the FPD and started drafting an application for a search warrant. An officer at the residence reported the Durango's Vehicle Identification Number (VIN) to Detective Diaz for the warrant application.

Defendant was named as the registered owner associated with the VIN. Lieutenant Barale learned defendant was on supervised probation and contacted defendant's probation officer, who provided defendant's phone number. When Lieutenant Barale called the number, a woman identified as April Atkinson answered but would not provide information about her location or defendant's location.

Shortly after Lieutenant Barale spoke to Atkinson, two deputies were called to respond to an assault reported at a nearby convenience store, which was ultimately determined to be false. Lieutenant Barale and the other deputy remained at 58 Stepp Acres Lane, where they saw a woman, later confirmed to be Atkinson, emerge from

the rear of the house. As Lieutenant Barale and the deputy approached Atkinson to speak with her, a noise prompted them to look back towards the Durango, where they saw a man next to the vehicle holding a bag with a pry bar sticking out. They also observed several items on the ground outside the Durango that had not been there before. An officer gave chase, but the man eluded him. After the unsuccessful chase, officers seized from the Durango $600 in cash, consisting entirely of bills in denominations of twenty dollars, and a lottery ticket.

Thereafter, the landlord of 58 Stepp Acres Lane came to the scene, and with his assistance, Lieutenant Barale and the deputy sheriff did a security sweep of the home. During this walkthrough, they found defendant in the living room. Subsequently, two probation officers arrived, and pursuant to the terms of defendant's probation, they searched defendant's home, accompanied by Lieutenant Barale, the sheriff's deputies, and defendant himself. During that search, Lieutenant Barale saw a stack of power tool batteries, a battery-operated cutoff tool, and a magnetic chisel.

After reviewing Detective Diaz's warrant application, a magistrate issued a search warrant for the Durango. The Durango was towed and stored for safekeeping prior to search, and FPD officers searched it on 18 February 2021. Inside, officers found cutting wheels/blades, a large hammer, a "strong arm" battery, ski masks, gloves, five unopened packs of Marlboro Gold cigarettes, a drill bit, a hyper-tough pry bar, pliers, and an electronic communication headset. After the search of the

Durango, FPD sought and obtained warrants for defendant's arrest.[1]

Detective Diaz later compared the cutting blades found in the Durango to the cut made to the ATM at Mr. Pete's Market, and they appeared to match both in width and in the color of paint that had been transferred to the blade. Detective Diaz also interviewed Atkinson, who was, according to Detective Diaz, "vague and contradictory" at times but admitted that defendant had given her the lottery ticket and was with her when she attempted to redeem it.

A few weeks later, Detective Diaz received a tip from an anonymous source. Using the source's information in combination with the information learned at defendant's residence on 17 February 2021, Detective Diaz applied for and executed a search warrant of 58 Stepp Acres Lane. The search of defendant's residence revealed, among other things, nine rechargeable batteries, one Hurst recharger, seven other chargers, six "Jaws of Life" of different sizes, five cartons of Marlboro Gold cigarettes, two cartons of Marlboro Gold 100s cigarettes, all of the remaining lottery tickets that had been taken from Mr. Pete's Market, the cover of an ATM similar to the model of ATM at Mr. Pete's Market, a face mask, DVR systems with cut wires, a metal cutoff wheel, a video endoscope wire with a camera, and a magnetic box containing controlled substances.

Before trial, defendant moved to suppress all the evidence, arguing that "the

---

[1] After the search of the Durango, Detective Diaz also applied for and executed a search warrant to search defendant's cell phone records. The warrant application for the cell phone records included a recitation of the events of 17 February 2021.

observations by law enforcement on [17 February 2021] at [his] residence and of items inside [his] vehicle were made improper[ly] without first obtaining a search warrant to search the residence and vehicle parked in [his] driveway." He argued that those observations and all the subsequently obtained evidence were inadmissible. The trial court denied the motion. Defendant then pled guilty to injury to real property, safecracking, conspiracy to commit breaking and entering, felony breaking and entering, two counts of felony larceny after breaking and entering, possession of burglary tools, and injury to personal property. He reserved, however, his right to appeal the denied suppression motion, and he subsequently appealed.

In a divided decision, the Court of Appeals affirmed the trial court's order and judgments. *State v. Norman*, 293 N.C. App. 744, 752, 901 S.E.2d 406, 412–13 (2024). The majority reasoned that the magistrate's issuance of a search warrant for the Durango was proper because officers had probable cause to seek a search warrant *before* attempting the knock and talk. *Id.* at 750, 901 S.E.2d at 411. It further held that officers did not impermissibly linger on the scene after knocking on the door because they were lawfully allowed to "secure[ ] and maintain[ ] the integrity of the scene." *Id.* at 750–51, 901 S.E.2d at 411–12. In any event, the majority stated, the inevitable discovery doctrine would apply. *Id.* at 751–52, 901 S.E.2d at 412. The dissent would have held that the officers did not have probable cause before the knock and talk, that the knock and talk was unconstitutionally performed, and that the inevitable discovery rule did not apply. *Id.* at 753–57, 901 S.E.2d at 413–15 (Wood,

J., dissenting). Defendant appealed based on the dissent.[2]

We review the denial of a motion to suppress to determine "whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law," which are reviewed de novo. *State v. Biber*, 365 N.C. 162, 167–68, 712 S.E.2d 874, 878 (2011). A magistrate's determination that probable cause exists to support a search warrant should be given "great deference," verifying only that the probable cause finding is supported by a substantial basis. *State v. Allman*, 369 N.C. 292, 294, 794 S.E.2d 301, 303 (2016) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983)).

Foundationally, the Fourth Amendment protects citizens against "unreasonable searches and seizures." U.S. Const. amend. IV. In Fourth Amendment analyses, "the home is first among equals" and receives heightened protection, as does the curtilage—"the area 'immediately surrounding and associated with the home.' " *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 1414 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984)). "Absent exigent circumstances, the police need a warrant to conduct a search of or seizure in a home, and a warrant may be issued only on a showing of probable cause." *Allman*, 369 N.C.

---

[2] *See generally* N.C.G.S. § 7A-30(2) (2023) (providing a right of appeal when there is a dissent at the Court of Appeals), *repealed by* Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d), 2023 N.C. Sess. Laws 760, 1171. The repeal of subsection 7A-30(2) applies only to cases filed with the Court of Appeals on or after 3 October 2023. *See* Current Operations Appropriations Act § 16.21(e). Defendant's notice of appeal was filed with the Court of Appeals prior to 3 October 2023.

at 293, 794 S.E.2d at 302 (citation omitted). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332. By statute, an application for a search warrant must contain a statement of probable cause "supported by one or more affidavits particularly setting forth the facts and circumstances establishing probable cause to believe that the items are in the places or in the possession of the individuals to be searched." N.C.G.S. § 15A-244 (2023); *see also Allman*, 369 N.C. at 294, 794 S.E.2d at 303. The nexus between the place to be searched and illegal activity alleged "need not be direct[ ] but . . . cannot be purely conclusory." *State v. Bailey*, 374 N.C. 332, 335, 841 S.E.2d 277, 280 (2020); *see also Allman*, 369 N.C. at 294, 794 S.E.2d at 303–04.

"[E]vidence derived from an unconstitutional search . . . is generally inadmissible" against the individual whose rights were violated. *State v. McKinney*, 361 N.C. 53, 58, 637 S.E.2d 868, 872 (2006). This "exclusionary rule" applies to the "fruit of the poisonous tree"—i.e., "incriminating evidence derived from the [illegally obtained] primary evidence." *Nix v. Williams*, 467 U.S. 431, 441, 104 S. Ct. 2501, 2507–08 (1984). However, "[i]f the affidavit supporting a warrant application includes information obtained illegally, '[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.' " *McKinney*, 361 N.C. at 61, 637

S.E.2d at 874 (second alteration in original) (quoting *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987)). "Thus, the admissibility of the evidence defendant sought to suppress turns on whether the untainted evidence in the supporting affidavit established probable cause to search his residence." *Id.* at 62, 637 S.E.2d at 874 (emphasis omitted). "With this tainted information excised, the validity of the search warrant (and consequently, the admissibility of the physical evidence seized thereunder) depends on whether the remaining information set forth in the warrant affidavit was sufficient to establish probable cause to search defendant's house." *Id.*

We need not, and do not, decide whether the officers' conduct during the knock and talk exceeded constitutional bounds.[3] This is so because, setting aside the information obtained as a result of the allegedly unconstitutional conduct, Detective Diaz's affidavit supported a fair probability that contraband would be found in the Durango.

With the information produced by the knock and talk excised, the affidavit set forth the following: On 12 February 2021, Marlboro Gold cigarettes, unactivated lottery tickets, and $2,600 in cash were stolen during a breaking and entering of Mr. Pete's Market in Fletcher. On 17 February 2021, Detective Diaz was informed by a lottery commission employee that someone had attempted to redeem a stolen lottery

---

[3] Defendant also contends that the inevitable discovery doctrine does not apply to prevent exclusion of evidence obtained as a result of the challenged knock and talk. Because we conclude that the search warrant was supported by probable cause without the allegedly unconstitutionally obtained evidence, we do not address this issue.

ticket at the Edneyville General Store the day before. Security video of the Edneyville General Store showed a woman attempt to redeem the ticket and, when her attempt was unsuccessful, leave the store and enter the passenger side of a black Dodge Durango with black rims and a missing front bumper. The Durango left the Edneyville General Store's parking lot and traveled toward Hendersonville. Driving in the same direction, Detective Diaz discovered a black Durango with a missing front bumper and black rims parked in a driveway. Detective Diaz checked the Durango's license plate number, which was visible as he drove by the driveway on Stepp Acres Lane. The plate was registered to EAN Holdings, a rental car company, for a 2019 Dodge Ram truck, and Detective Diaz knew, based on his experience and training, that criminals commonly use fictitious license plates to avoid identification by law enforcement. These facts demonstrate a fair probability that property stolen from Mr. Pete's Market would be found in the Durango.

The Court of Appeals correctly concluded that the search warrant for the Durango was issued upon a showing of probable cause, and we affirm its holding on that point. We otherwise modify the Court of Appeals' decision to the extent that its analysis is inconsistent with this opinion.

MODIFIED AND AFFIRMED.

Justice EARLS concurring.

I agree with the majority's conclusion that the search warrant was properly supported by probable cause here because Detective Diaz's affidavit contained sufficient facts to demonstrate a fair probability that property stolen from Mr. Pete's Market would be found in the Durango, even without the information gained from his peering into the vehicle. Nevertheless, I write separately because I believe it is improper and unhelpful for this Court to refuse to decide whether the officer's conduct exceeded the scope of the license allowed in a "knock and talk" situation. The constitutional interests at stake here are substantial, and walking up to a residence to speak with individuals is something law enforcement officers do day in and day out across this state. As a result of the majority's treatment of this case, it remains unclear whether walking around a vehicle parked in a driveway on private property is constitutionally permitted without a warrant. As a court of last resort reviewing a motion to suppress, we review the motion de novo. *State v. Biber*, 365 N.C. 162, 167–68 (2011). We therefore have an obligation to look at the merits of the case in its entirety.

## I.   Legal Principles

The Fourth Amendment protects "persons, houses, papers, and effects" from "unreasonable searches and seizures." U.S. Const. amend. IV. Our first task is to decide whether the officers' post-knock inspection of the Durango was a "search" at

all. If it was, we then ask whether it was constitutionally "unreasonable." And because Detective Diaz's affidavit recounted what he saw inside the car, we must also consider whether the warrant that followed rested on probable cause.

The Fourth Amendment sets a "simple baseline": when the State "obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred." *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (cleaned up) (quoting *United States v. Jones*, 565 U.S. 400, 406–07, n.3 (2012)). That rule reflects the Fourth Amendment's "close connection to property" and its "particular concern for government trespass" on the areas it names. *Jones*, 565 U.S. at 405–06. A "physical intrusion" into a constitutionally protected area to gather information is—as it always has been—a search. *Id.* at 401; *see also Jardines*, 569 U.S. at 5.[1]

Of those protected spaces, the home stands "first among equals." *Jardines*, 569 U.S. at 6. At the Fourth Amendment's "very core" is the right to retreat into one's "own home and there be free from unreasonable governmental intrusion." *Id.* (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). To give "full practical effect to

---

[1] Later decisions, beginning with *Katz v. United States*, 389 U.S. 347 (1967), "expanded our conception of the Amendment to protect certain expectations of privacy as well." *Carpenter v. United States*, 585 U.S. 296, 304 (2018). But the "*Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines*, 569 U.S. at 11 (quoting *Jones*, 565 U.S. at 409). Because we resolve this case using "the Fourth Amendment's property-rights baseline," we "need not decide whether the officers' investigation" violated Mr. Norman's "expectation of privacy under *Katz*." *Id.*

that right," the protections afforded the home embrace the area immediately surrounding and "intimately linked to" it. *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (cleaned up). The Fourth Amendment treats this "buffer" zone—called the curtilage—as part of the home itself. *State v. Grice*, 367 N.C. 753, 759 (2015).[2] A car parked within that protected area enjoys the same protection. *Collins*, 584 U.S. at 596. Because the "physical entry of the home is the chief evil against which [the Fourth Amendment] is directed," the Constitution "draws a firm line" around it. *Lange v. California*, 141 S. Ct. 2011, 2018 (2021) (cleaned up) (quoting *Payton v. New York*, 445 U. S. 573, 585, 590 (1980)). A police officer therefore searches the curtilage—and by extension, the home—by "physically intrud[ing]" on that space "to gather evidence." *Collins*, 584 U.S. at 593 (citing *Jardines*, 569 U.S. at 11). That conduct is "presumptively unreasonable absent a warrant." *Id.*

The phrase "physical intrusion" carries forward traditional property-law principles. *State v. Miller*, 367 N.C. 702, 712 (2014). To "intrude" is not just to enter

---

[2] From our courts' earliest days, we have recognized the curtilage as an extension of the home. *See, e.g.*, *State v. Twitty*, 2 N.C. (1 Hayw.) 102 (1794). We have likewise affirmed that special legal protection attaches to the curtilage, like the home itself:

> [T]he law throws her mantle around the dwelling of man, because it is the place of his repose, and protects not only the house in which he sleeps, but also all others appurtenant thereto, as parcel or parts thereof, from mediated harm; thus the kitchen, the laundry, the meat or smoke house, and the dairy are within its protection; for they are all used as parts of one whole, each contributing in its way to the comfort and convenience of the place as a mansion or dwelling.

*State v. Fields*, 315 N.C. 191, 194 (1985) (quoting *State v. Langford*, 12 N.C. (1 Dev.) 253, 253–54 (1827)).

a space, but to do so "without permission." *Intrusion, Black's Law Dictionary* (12th ed. 2024). In that way, a physical intrusion mirrors a common-law trespass. *See Whitley v. Jones*, 238 N.C. 332, 336 (1953) (defining a trespass as "[e]very unauthorized, and therefore unlawful, entry into the close of another"). Both terms point to the same wrong: "enter[ing] or remain[ing]" on property without the owner's consent. *See Smith v. Voncannon*, 283 N.C. 656, 660 (1973) (cleaned up). And both of those wrongs strike at the same possessory interest—a property owner's right to exclude. *See* John G. Sprankling, *Understanding Property Law* § 1.03 (5th ed. 2023). That right gives the owner control over who may access their property and on what terms. *Id.* It therefore marks the line between a welcome guest and an unwelcome interloper. *See Jardines*, 569 U.S. at 8 ("[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." (alteration in original) (quoting *Entick v. Carrington* (1765), 95 Eng. Rep. 807, 817 (KB))). When someone crosses that line—by entering without consent or exceeding the permission given—they override the owner's authority to decide who may come and go. *See Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).

So when a person steps onto the curtilage, the question is whether he had the owner's permission—first to enter, and then to remain. *Jardines*, 569 U.S. at 6–7. That consent may be express or implied. *Holcomb v. Colonial Assocs., L.L.C.*, 358 N.C. 501, 510 (2004). The "normal customs of the community" shape whether—and when—a person has "implied permission to enter another's land." *Id.*; *see also Smith*,

283 N.C. at 661–62. But even a lawful visitor can become a trespasser if he "act[s] in excess or abuse of his authority to enter." *Smith*, 283 N.C. at 660; *see also Gardner v. Rowland*, 24 N.C. (2 Ired.) 247, 250 (1842) ("He, who abuses a *legal* license, is a trespasser *ab initio*."). Once the owner's consent ends, staying on the property is unauthorized—and thus a trespass. *See Blackwood v. Cates*, 297 N.C. 163, 167 (1979) (holding that defendant who entered a home with "implied consent" exceeded that permission—and became "liable for trespass"—by his "later wrongdoing"); *see also Bear v. Harris*, 118 N.C. 476, 476 (1896); *Norfolk S. R.R. Co. v. Rapid Transit Co.*, 197 N.C. 505, 506 (1929).

Those principles inform when a "physical intrusion" on the curtilage counts as a search. *See Jardines*, 569 U.S. at 7. The Fourth Amendment does not "absolutely prohibit[ ]" police officers from "crossing the curtilage and approaching the home." *Grice*, 367 N.C. at 759. Customary norms allow visitors to walk up to the front door and speak with a home's occupant. *See id.*; *Jardines*, 569 U.S. at 8. This reflects a shared social understanding—a "doorbell or knocker on the front door often signals a homeowner's consent" for guests to briefly enter. *Bovat v. Vermont*, 141 S. Ct. 22, 22 (2020) (Statement of Gorsuch, J., respecting the denial of cert.); *see Smith*, 283 N.C. at 662 (explaining that the "customs prevailing in the community" treat "a driveway or a walkway leading to the entrance of a residence" as "an expression of the landowner's consent" to approach on "any lawful mission"). This implied license is a

part of every day. It is what lets Girl Scouts sell cookies, neighbors drop by for tea, and trick-or-treaters collect candy. *See Jardines*, 569 U.S. at 8.

Police, too, may take up that customary invitation. *Id.* An officer, like anyone else, may "approach a home and knock" precisely *"because all are invited to do that."* *Id.* at 8, 9 n.4. So long as police are "in a place where the public is allowed to be," *State v. Huddy*, 253 N.C. App. 148, 151 (2017) (cleaned up), and doing "no more than any private citizen might do," there is no trespass—and therefore no search, *Jardines*, 569 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)); *see also Florida v. Riley*, 488 U.S. 445, 451 (1989) (plurality opinion) (concluding there was no search because the police officer "did no more" than what "[a]ny member of the public could legally have [done]").

But the knock-and-talk license is limited. *See Grice*, 367 N.C. at 762. It allows a visitor to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. A homeowner tacitly consents to that range of behavior because it is "customary, usual, reasonable, respectful, ordinary, typical, [and] nonalarming." *Id.* at 8, n.2. But "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 9. As Justice Scalia put it:

> To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police.

*Id.* Said differently, a homeowner's consent to knock does not carry with it permission to "explore details of the home (including its curtilage)" in "hopes of discovering incriminating evidence." *Id.* at 11, 9; *see also id.* at 9, n.4 ("[N]o one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search."). The same social norms that create the implied license also mark its edges. *See id.* at 9. When a visitor steps beyond those customary limits, he exceeds the homeowner's consent and becomes an "unlicensed physical intru[der]." *Id.* at 7.

The knock-and-talk doctrine rests on the same logic. Officers may enter the curtilage and knock on the door because that is "no more than any private citizen might do." *Id.* at 8 (quoting *King*, 563 U.S. at 469). By the same logic, though, a homeowner's tacit consent ends when police do *more* than "what a 'reasonably respectful citizen' is permitted to do." *State v. Lewis*, No. COA17-888-2, slip op. at 4 (N.C. Ct. App. Nov. 5, 2019) (unpublished) (quoting *Huddy*, 253 N.C. App. at 151). Because ordinary visitors are not welcomed onto the curtilage to hunt for evidence, officers, too, "may not abuse the limited scope of th[e implied] license by snooping around the premises." *Bovat*, 141 S. Ct. at 22 (Statement of Gorsuch, J., respecting the denial of cert.); *see also Covey v. Assessor of Ohio County*, 777 F.3d 186, 193 (4th Cir. 2015) ("[T]he right to knock and talk does not entail a right to conduct a general investigation on a home's curtilage.").

Of course, the Fourth Amendment does not require officers to "shield their eyes when passing by the home on public thoroughfares." *Jardines*, 569 U.S. at 7 (cleaned

up) (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Police may see what is exposed to public view—including contraband "left out in the open on the curtilage." *Grice*, 367 N.C. at 759. But observing the curtilage from a "lawful vantage point" is different from physically invading it. *See Collins*, 584 U.S. at 600. Once an officer enters a protected space, his "leave to gather information is sharply circumscribed." *Jardines*, 569 U.S. at 7. And just as neighbors and Girl Scouts are not tacitly permitted to wander the curtilage "trawl[ing] for evidence," neither are police. *Id.* at 6; *see also United States v. McNeil*, 126 F.4th 935, 944 (4th Cir. 2025) ("*Jardines*'s 'implied license' theory allows the police to do only what any private citizen might, which usually does not include roaming around a neighbor's backyard because a knock at the front door has been unavailing." (cleaned up)).

## II.    Did the officers here exceed the knock-and-talk license?

Everyone agrees that the Durango sat in the curtilage. Everyone also agrees that Detective Diaz and his colleagues entered that space and inspected the car. The question is whether the officers stayed within the homeowner's implied consent to knock and talk—or whether they learned what they learned through an "unlicensed physical intrusion." *Jardines*, 569 U.S. at 7.

Detective Diaz and his colleagues' initial entry onto the curtilage was lawful. After parking along the street in front of the home, Detective Diaz exited his car and took the "most direct route" to the front door —what he called the "best way to go" and what the trial court labeled "the shortest route from his vehicle." That path led

"through the grassy area in front of" the Durango, straight past its front bumper. He did not pass the car's rear or driver's side windows, nor could he see inside the vehicle on his way to the door. Detective Diaz and another officer climbed the steps onto the front porch, while the other two waited by the car. He knocked several times; no one answered. Up to that point, the officers did what any private citizen could: "approach the home by the front path, knock promptly," and "wait briefly to be received." *Id.* at 8.

When a knock goes unanswered, a visitor's license ends—and they must leave "absent invitation to linger longer." *Id.*; *see also id.* at 20 (Alito, J., dissenting) ("The license is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer) leave."). There was no such invitation here—but the officers lingered anyway. And more than that, they "continued [their] investigation by walking over to a car on the property" and inspecting it. *Lewis*, slip op. at 5.

Detective Diaz walked down the porch steps into the driveway and past the Durango's passenger side to its rear. This was, as Detective Diaz admitted, a "depart[ure]" from the route he took to the door—and one made for investigative reasons. He wanted to examine the license plate and verify that he typed the correct number into his computer. To double-check, he radioed dispatch to run the tag again. Then he waited in the driveway—more than a minute—for the results; dispatch confirmed his earlier findings. Detective Diaz then stepped off the driveway and into

the grass, walking from the back of the Durango around to its driver's side. It was his first look at the car from that angle. And that new position gave him a new line of sight. Only then could he peer through the driver's side windows—and only then did he spot the cigarettes and the lottery ticket on the driver's seat. He soon left to apply for a search warrant.

Other officers, however, stayed on the curtilage and gathered information about the Durango. At Detective Diaz's request, Deputy Stagg looked through the car's windows, found its VIN, and passed it along. That inspection, like the detective's own walk-around, required physical maneuvering within the curtilage to gather information from the parked car. *Cf. Collins*, 584 U.S. at 597, n.3 (noting that an officer searched a motorcycle by physically intruding "on curtilage, remov[ing] a tarp to reveal license plate and vehicle identification numbers, and us[ing] those numbers to confirm that the defendant committed a crime"). Detective Diaz then used the VIN in his warrant affidavit to identify Mr. Norman as the Durango's owner. Without that information, he later testified, he could not have done so.

In my view, the officers searched the Durango because they "learned what they learned only by physically intruding on [the defendant's] property to gather evidence." *Jardines*, 569 U.S. at 11. While they had an implied license to approach the front door for a brief knock and talk, they exceeded that license by lingering in the curtilage and venturing "beyond where a neighbor would" to "obtain information not otherwise accessible." *Collins*, 584 U.S. at 597 n.3, 600. The problem is not that

Detective Diaz and his colleagues were investigating crime—that is their job, after all. What matters is *where* they did so. This case would look different if the Durango had been parked on a public street. Or if the evidence had been left out in the open—on a lawn chair, say—where "the public passing by on the sidewalk" could see it. *State v. Hauser*, 342 N.C. 382, 386 (1995). But the Durango was not in a public space; it sat within the curtilage, "where privacy expectations are most heightened," and where officers' "leave to gather information is sharply circumscribed." *Jardines*, 569 U.S. at 7 (cleaned up). Nor were the car's contents visible from any "public vantage point." *Cf. Ciraolo*, 476 U.S. at 213. A person walking a dog or training for a marathon could not have seen inside the Durango from the street. To glimpse inside the car, then, the police had to physically enter the curtilage and maneuver within that space to get a particular vantage.

That separates this case from *Grice*, where officers conducting a knock and talk spotted marijuana plants "outside in [the] yard for any member of the public to see." 367 N.C. at 764. The plants were "in plain view of [the] driveway," exposed to all visitors coming to the main door. *Id.* at 756. And the police did not discover the marijuana after "wander[ing] the property," peering inside any items, or moving to other parts of the property. *Id.* at 757, 762. They simply observed what was "left out in the open on the curtilage"—clearly visible from a lawful vantage point and "immediately apparent" as contraband. *Id.* at 759, 761.

Here, by contrast, the items inside the Durango were *not* left in the yard or exposed to any guest nearing the door. Detective Diaz had to go out of his way to find them. He saw nothing from the street, nothing on his path to the door, and nothing while passing along the passenger side to the rear. It was only after stepping off the driveway, into the grass, and over to the driver's side window that he finally spotted the cigarettes and ticket on the front seat. That kind of maneuvering shows that the evidence inside the Durango was neither "left out in the open on the curtilage" nor "immediately apparent" to a typical visitor. *Cf. id.*

And that same investigatory conduct sets the officers' actions apart from those of a "reasonably respectful" guest. *Huddy*, 253 N.C. App. at 152. If no one answers after a visitor raps on the door and "wait[s] briefly to be received," the knock-and-talk license has run its course—and with it, the visitor's tacit permission to stay on the curtilage. *Jardines*, 569 U.S. at 8. A typical guest would take that silence as a cue to leave, not an invitation to prowl the property for evidence of a crime. *See id.* at 8–9*; see also McNeil*, 126 F.4th at 944 (explaining that an unanswered knock would "prompt any normal social visitor to depart rather than trawl for evidence" in the curtilage (cleaned up)). That is true even when a car sits within the curtilage. Its presence does not strip the area of Fourth Amendment protection or open it to inspection by uninvited eyes. *Collins*, 584 U.S. at 598–600. "So long as it is curtilage, a parking patio or carport"—or even the apex of a U-shaped driveway—remains "protect[ed] from trespass." *Id.* at 600. For that reason, even a "short walk up the

driveway" becomes a search when an officer strays from the customary path to the door and ventures "beyond where a neighbor would" to inspect a vehicle and collect information "not otherwise accessible." *Id.* at 597 n.3, 600; *see also Lewis*, slip op. at 5–6 (holding that the officer exceeded knock-and-talk license by lingering in the curtilage, departing from "the path that other invitees would use to leave the front porch," and walking deeper into the yard to peer inside a parked car). Put simply, there "is no customary invitation to do *that*." *Jardines*, 569 U.S. at 9.

The same is true of the officers' actions here. A Girl Scout or delivery driver would not, after having no luck at the door, wander the curtilage to inspect parked vehicles. *See id.* at 8; *id.* at 19 (Alito, J., dissenting) ("A visitor cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use."). And a "typical person" would be alarmed "to find a stranger snooping about" the driveway, peering inside the family van or scrutinizing their Harley Davidson. *Cf. id.* at 9, n.3 (majority opinion). Those are not the actions expected of a guest—and not the sort of behavior a homeowner tacitly invites. *See id.* at 8–9.

By lingering on the curtilage to inspect the Durango—conduct neither typical of nor permitted to an ordinary visitor—the officers exceeded the knock-and-talk license and physically "occup[ied]" a protected space to "engage in conduct not explicitly or implicitly permitted by the homeowner." *Id.* at 6. For that reason, their investigation on the curtilage was "accomplished by an unlicensed physical

intrusion." *Id.* at 7. It was therefore a search. *Id.* at 8. And because the officers had no warrant and no exception applies, that search was unreasonable under the Fourth Amendment. *See Collins*, 584 U.S. at 593.

Therefore, while I concur that ultimately the search warrant obtained here was adequately supported by probable cause, I would also do the work of deciding whether the Fourth Amendment rights of the property owners here were violated by the officers' actions prior to obtaining the search warrant.

Justices DIETZ and RIGGS join in this concurring opinion.